IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA for the Use and Benefit of DUNCAN PIPELINE, INC., and DUNCAN PIPELINE, INC., | ) ) ) ) | |
| *Plaintiff*, | ) ) | CIVIL ACTION FILE |
| v. | ) ) | NO. 4:11-cv-00092-WTM-GRS |
| WALBRIDGE ALDINGER COMPANY, TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, and LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) ) ) | |
| *Defendants*. | ) ) | |

**Memorandum in Support of Defendants' Motion for Partial Summary Judgment**

Defendants Walbridge Aldinger Company ("Walbridge"), Travelers Casualty and Surety Company of America and Liberty Mutual Insurance Company (the "Sureties") submit this Memorandum in Support of their Motion for Partial Summary Judgment as to particular claims asserted by Duncan Pipeline, Inc. ("Duncan") in its Complaint.

**I.      Summary of Argument**

This case is about a subcontractor that waited until its work was nearly complete before attempting to recover claims against a general contractor. Duncan did not initially pursue these claims because the losses that it incurred were apparently the result of its own bid errors and failure to understand its subcontract requirements. It was only when its losses became significant that it then tried to recover amounts from Walbridge. The problem for Duncan is that by the time it decided to pursue these claims, it had signed and submitted to Walbridge waivers and releases of the claims and waived its claims by failing to follow its subcontract obligations.

1

II.     **Factual Background**

In 2009, Walbridge entered into a contract (the "Prime Contract") with the United States Army Corps of Engineers (the "Corps") under which Walbridge agreed to serve as the general contractor for the construction of the IBCT project at Fort Stewart, Georgia (the "Project"). [Compl. ¶ 10].  In accordance with the Miller Act, 40 U.S.C. § 3131(b), Travelers and Liberty, as sureties, and Walbridge, as principal, issued a payment bond to the Corps. [Compl. ¶¶ 44-47].

In July 22, 2009, Walbridge entered into a subcontract (the "Subcontract") with Duncan, under which Duncan agreed to supply labor and material for the Project's water distribution system.  [Duncan Dep. Ex. 1/Ex. D hereto[1]] Duncan's work generally included excavating trenches, installing various sizes of water pipe, valves, manholes, fire hydrants, and fittings, and the backfilling the trenches based on the plans, specifications, and other contract documents that were part of Subcontract. [Duncan Dep. Ex. 1 – bates 000026/Ex. E hereto]

The Subcontract establishes certain protocol for Duncan to follow in the event that it has a claim for extra or changed work.  Specifically, the Subcontract states that "[w]ithin fourteen (14) days of receipt of direction to perform changed work, and in any event with the time permitted by the Agreement Between the Owner and Contractor for submission of quotations to the Owner, Subcontractor shall submit to Contractor one (1) original and six (6) copies of its quotation proposing the increase or decrease in the Subcontract Price for the changed work." [Duncan Ex. 1 - Article VII/Ex. D hereto].  The Subcontract further provides that Duncan "shall

---

[1]For the Court's convenience, the deposition testimonies are attached as follows: Ward Duncan as Exhibit A; Ward Duncan's 30(b)(6) as Exhibit B;  and relevant excerpts of John Walker as Exhibit C. All other exhibits are identified by the deponent and deposition exhibit no., with the exhibit identified by letter attached to this Memorandum.

not be entitled to receive any amount for overhead or profit or for any inefficiencies or loss of productivity and shall not assert any claim for overhead or profit or damages due to loss of productivity or inefficiencies." [Duncan Ex. 1 - Article V/Ex. D hereto]. The reason for these terms is two-fold: first, to put Walbridge on notice that Duncan has a claim so that Walbridge can assess the claim and respond accordingly, and second, to allow Walbridge to pass the claim through to the Corps in a timely fashion in the event that Walbridge determines that the Corps may be ultimately liable for the claim.

Duncan commenced its work in August 2009. [Duncan Dep. 90:1-3]. Duncan contends that around this time it was forced to perform work that it considered as a change to its Subcontract scope. Here, Duncan claims it was required to (a) install bell restraints that it claims were not required by the Subcontract, (b) perform additional excavation work for reasons beyond its control, and (c) remobilize crews because of interferences that it encountered during its excavation work. [Duncan Ex. 4 - p. 3/Ex. F hereto].

Duncan states that it commenced installing the additional bell restraints in August or September 2009, and completed this work no later than May 26, 2010. [Duncan 30(b)(6) 57:24-58:3; Duncan Dep. 90:1-3; Duncan Dep. 133:24-134:24; Duncan Dep. 89:17-22]. Duncan first submitted this claim to Walbridge, in writing, no earlier than May 18, 2010. [Duncan Dep. 88:4-89:25; Duncan Ex. 4/Ex. F hereto]. Walbridge denied the claim on the grounds that (a) the work was required by the Subcontract and therefore was not changed work, and (b) the claim was untimely in that it was submitted after the work was performed and roughly 8 months after the claim should have been submitted. [Walker Dep. 164:7-166:16; Walker Ex. 29/Ex. G hereto].

As to the additional excavation work and remobilization of crews, Duncan contends that this work began in August or September 2009. [Duncan 30(b)(6) Dep. 58:7-12]. The work was

completed in April or May of 2010. [*Id.*]. Duncan first submitted the claim as a "Loss of Production and Excessive Excavation Depth" claim. [Duncan Ex. 4/Ex. F hereto] The claim was given to Walbridge, in writing, no earlier than July 23, 2010. [*Id.*] Walbridge again denied the claim because (a) the excavation work that Duncan claimed was an extra was contemplated in the Subcontract and was not changed work, and (b) the claim was untimely because it was submitted after almost all of the work was complete and almost 10 months after the claim should have been submitted. [Walker Dep. Ex. 29/Ex. G hereto]. In short, Duncan did not submit written notice of any claims until May 18, 2010, i.e. no earlier than eight and as late as ten months after the Duncan began performing the purported changed work. [Duncan Dep. 88:4-14; Duncan Dep. Ex. 4/Ex. F hereto].

It appears that these claims were an afterthought to Duncan because, during the period when Duncan was performing the alleged extra work, Duncan signed periodic waivers disclaiming all "construction lien rights, rights against any payment bonds, and claims arising from the improvement," that arose prior to the date of each waiver. [Duncan Dep. Ex. 11/Ex. H hereto]. Duncan issued nine waivers between August 20, 2009 and April 20, 2010. [*Id.*] Under the most recent of these waivers, Duncan released, waived, or disclaimed its right to assert claims on the Project for "all amounts due to [Duncan] for the contract improvements provided through" April 20, 2010. [*Id.*] Duncan substantially completed installing bell restraints and performing excavation activities roughly a month later. [Duncan Dep. 89:17-25].

In April 2011, Duncan filed this lawsuit seeking damages related to work performed on the Project. While the Complaint does not discuss specific damages sought by Duncan, Ward Duncan's deposition and Duncan's Notice of Payment Bond Claim provide the breakdown of Duncan's claims damages. [Duncan Dep. Ex. 4/Ex. F hereto] The claims that are the subject of

this Motion are, (a) Duncan's claim for additional compensation relating to the bell restraints, (b) Duncan's claim for additional compensation relating to alleged additional excavation work, and (c) Duncan's claim for additional compensation relating to mobilization and remobilization. [*Id.*]. Although Walbridge believes that the work for which Duncan is claiming additional compensation was part of Duncan's original Subcontract scope of work, this is not the issue in this Motion. Rather, at issue is that fact that Duncan waived its right to assert these claims by signing waivers and releases and because of the specific Subcontract terms. In addition, Walbridge requests that Duncan's claim for conversion, Duncan's claim for punitive damages, and Duncan's Prompt Pay Act claims, likewise be dismissed because Duncan provides no factual or legal basis for these claims during the entire course of discovery.

### III. Argument and Citation to Authority

#### A. Standard for Summary Judgment

Courts should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The moving party's burden is discharged by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also, U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991). Once the movant has met this burden, the opposing party must then present evidence establishing that there is a genuine issue of material fact. *Celotex Corp. v. Catreet,* 477 U.S. at 325.

An issue is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 249-250 (1986). Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248. Thus, in order to create a genuine issue of material fact for trial, Duncan must come forward with specific evidence of every element essential to its case when Defendants have the burden of proof, and have made a plausible showing of the absence of evidence of the necessary element. *Celotex Corp. v. Catreet,* 477 U.S. at 32.

      **B.**      **Duncan's Claims Related to the Bell Restraints, Additional Excavation and Loss of Production, and Remobilization Are Barred by its Execution of the Partial Unconditional Waivers**

Duncan released its claims related to the bell restraints, loss of production and excessive excavation, and excessive mobilization and demobilization by executing partial unconditional waivers throughout the Subcontract performance period. As no material factual question exists regarding Duncan's execution of these waivers, summary judgment is appropriate.

Duncan signed nine partial unconditional waivers over the Project's course. Each waiver contained language that that Duncan waived its "construction lien rights, rights against any payment bonds, and claims arising from the improvement, in the amount of [amount] for labor/materials provided through [date]." [Duncan Dep. Ex. 11/Ex. H hereto]. Further each "waiver, together with all previous waivers, does cover all amounts due to [Duncan] for the contract improvements provided through the date as above." [*Id.*] Duncan executed the last waiver on April 23, 2010, covering all claims through April 20, 2010. [*Id.*] The waivers and releases were submitted by Duncan in order to induce payment from Walbridge, which they did, because Duncan was paid progress payments through its April 2010 draw request. [Duncan Dep. Ex. 16/Ex. I hereto; Duncan Dep. 124:15 - 125:8]. By executing this waiver, Duncan released its payment bond claims and breach of contract claims related to the bell restraints, loss of

production and excessive excavation, and mobilization/demobilization for costs incurred up to and including April 20, 2010.

Claims by a subcontractor against the general contractor and its surety under the Miller Act may be waived. 40 U.S.C. § 3133(c); *see, Youngstown Welding and Engineering Co. v. Travelers Indem. Co.*, 802 F.2d 1164 (9th Cir. 1986); *U.S. for the Use of Nova Enterprises, Inc. v. Reliance Ins. Co.,* 977 F.2d 575 (4th Cir. 1992). Under the Act, the waiver must be "(1) in writing, (2) signed by the person whose right is waived, and (3) executed after the person whose right is waived has furnished labor or material for use in the performance of the contract." 40. U.S.C. § 3133(c).  Federal courts may look to state law for guidance for purposes of determining the clarity of a release.  *Youngstown Welding and Engineering*, 802 F.2d at 1167, *but see, U.S. for the Use of Nova Enterprises, Inc. v. Reliance Ins. Co.,* 977 F.2d 575, *1 (waiver was clear and explicit, therefore court did not need to look at state law).

Although the language in Duncan's waiver is "clear and explicit," both Michigan and Georgia law support the fact that Duncan waived its claims, as well.[2] *See, Johnson Controls, Inc. v. Hunt Const. Group, Inc.*, No. 02-CV-74039-DT, 2004 WL 3323608 (E.D. Mich. Aug. 13, 2003) (upholding partial waiver that released "any and all claims" related to the project); *Hunt Const. Group, Inc. v. Construction Services, Inc.*, 375 F.Supp.2d. 612 (E.D. Mich. 2005) (upholding partial waiver that released all claims and causes of action despite one party's previous notice of an existing claim); *Citadel Corp. v. Sun Chemical Corp.*, 212 Ga.App. 875, 443 S.E.2d 489, 490-491 (1994) (upholding broad release of all claims contained in signed modifications).

---

[2] While the Project is located in Georgia, the Subcontract's choice of law provision states that Michigan law governs this dispute. [Duncan Dep. Ex. 1 - Article XXVIII(k)/Ex. D hereto]

The primary determination when enforcing a release is whether a release's language is ambiguous. *See, Johnson Controls*, 2004 WL 3323608 at *5 (citing *Taggart v. United States*, 880 F.2d 867, 870 (6th Cir. 1989) (interpreting Michigan law)) (stating that "if the language is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument"). Michigan law is consistent with Georgia law. *See, Citadel Corp.*, 443 S.E.2d at 490 (interpreting broad release as unambiguous and susceptible to only one reasonable construction); *Warrior Constructors, Inc. v. E.C. Ernst Company, Inc.,* 127 Ga.App. 839, 195 S.E.2d 261, 262 (1973) (Georgia law will enforce a waiver of claim by a subcontractor or supplier in favor of a general contractor).

Unambiguous releases will be interpreted in accordance with their terms, with the parties' intent being determined solely by the release's terms. *See, Taggart*, 880 F.2d at 870; *Citadel*, 443 S.E.2d at 490. The mere fact that a release is broad will not render a release ambiguous or unenforceable. *See, Cole v. Ladbroke Racing Michigan, Inc.*, 241 Mich.App. 1, 614 N.W.2d 169, 176 (2000); *Citadel*, 443 S.E.2d at 490. Rather, language is ambiguous only where it is susceptible to more than one reasonable interpretation. *See, Cole*, 614 N.W.2d at 176; *Citadel*, 443 S.E.2d at 490.

The waivers Duncan signed have one meaning, to wit, that all claims arising on or before the listed date are waived. The purpose of the waiver was to procure payment from Walbridge and it is undisputed that Duncan received all payments that corresponded to the waivers. The waivers were provided after the labor and material at issue was delivered to the Project. In sum, Duncan released all claims that arose before April 20, 2010.

As such, Duncan released its claims related to the bell restraints by signing waivers for labor and material delivered on or before April 20, 2010. Duncan was aware of the purported

8

additional bell restraint work and began performing that work in August 2009. [Duncan 30(b)(6) 57:24-58:3; Duncan Dep. 90:1-4; 134:13-24]. Thus, Duncan's claim for additional compensation for the bell restraints arose, if ever, in August of 2009. [*Id.*] Duncan signed at least eight partial unconditional waivers that "cover[ed] all amounts due to [Duncan] for the contract improvements" after learning of the bell restraint requirement. [Duncan Dep. Ex. 11/Ex. H hereto]. By signing these waivers, Duncan waived its right to recover additional compensation related to the bell restraints for all claims that arose on or before April 20, 2010. And, as the pipe work was virtually complete on April 12, 2010, Duncan waived most if not all of its claims related to the bell restraints. Accordingly, because there are no genuine issues as to any material facts, this Court should, at minimum, grant summary judgment dismissing Duncan's claims related to the bell restraints that arose on or before April 20, 2010.

Similarly, Duncan released its claims related to loss of production and excessive excavation depths by signing waivers releasing all claims that arose on or before April 20, 2010. This claim encompasses a variety of claims, including acceleration, inefficient crew stacking, out of sequence work, loss of productivity, and additional excavation. [Duncan Dep. Ex. 4/Ex. F hereto]. Duncan acknowledges that this work began in August 2009 and ended around April or May 2010. [Duncan 30(b)(6) 58:7-12]. And, as of April 12, 2010, almost all of the activities, including pipe installation were between 98-100% complete. [Duncan Dep. 122:16-21; Ward Dep. Ex. 15/Ex. J hereto]. Thus, most, if not all, of Duncan's claim for lack of production and excessive excavation occurred before Duncan signed the last waiver on April 23, 2010.

In a similar situation, the court in *Hunt Cost. Group, Inc. v. Construction Services, Inc.* granted summary judgment dismissing claims for out of schedule work, inefficiencies, and acceleration based on releases signed by the subcontractor. 375 F.Supp.2d at 620-21. The court

found that the claims, which arose before the releases were signed, were precluded. *Id.* at 618-19. Here, Duncan's claims for acceleration, inefficiencies from crew stacking, out of sequence work, loss of production, and additional excavation that arose prior to April 20, 2010, are precluded. Accordingly, this Court should grant summary judgment dismissing Duncan's claim for loss of production and excessive excavation.

Like Duncan's claims for the bell restraints and loss of production and excessive excavation, Duncan released its claim for mobilization/demobilizations that occurred on or before April 20, 2010. [Duncan Ex. 4/Ex. F hereto]. Duncan alleges damages of $115,263.86 due for mobilization and demobilization of its crews between November of 2009 and June of 2010. [*Id.*]. Duncan waived every mobilization/demobilization cost that occurred on or before April 20, 2010 by signing the partial unconditional waiver. Accordingly, Duncan waived its claim for any amounts for mobilization/demobilization that arose on or before April 20, 2010.

### C. Duncan's Claims related to the Bell Restraints, Loss of Production, and Excessive Mobilization Are Barred by its Failure to Provide Notice as Required by the Subcontract

The Subcontract between Walbridge and Duncan required Duncan to "promptly give written notice of any claim for adjustment of the Subcontract Price…within the time limits provided in this Subcontract." [Duncan Ex. 1 - Article II/Ex. D hereto]. Under the Subcontract, Duncan was required to give written notice of any changes within fourteen days of being told to perform the work. [*Id.* - Article VII]. Duncan did not provide written notice of its claims related to the bell restraints, loss of production and excessive excavation, and mobilization/demobilization until at least eight months after purportedly being told to perform the work. [Duncan Dep. Ex. 4/Ex. F hereto].

Both Michigan and Georgia require strict compliance with contractual notice provisions. *See, Associated Mechanical Contractors, Inc. v. Martin K. Eby Constr. Co.*, 271 F.3d 1309, 1316-17 (11th Cir. 2001); *PCL Civil Constructors, Inc. v. Department of Transportation*, No. 0237184, 2003 WL 22715798, *2 (Mich. Ct. App. 2003) (finding that the contractor waived its claim by failing to comply with the contractual notice provision despite a complete lack of prejudice). Claims not submitted in compliance with the notice requirements are waived. *See Associated Mechanical Contractors*, 271 F.3d at 1316; *PCL Civil Constructors*, 2003 WL 22715798 at *2.

As illustrated in *Associated Mechanical Contractors,* even stricter compliance is required in situations involving multiple contracts between the owner, prime contractor, and subcontractors. *See* 271 F.3d at 1316. In *Associated Mechanical Contractors*, the subcontract contained a provision requiring written notice within ten days of when the compensable event arose. *Id.* at 1311. The subcontractor failed to provide notice within ten day of the event's occurrence. While the contractor had actual notice of the event, the court found that actual notice failed to satisfy the notice provision's requirements because "the contract in this case [was] a subcontract which explicitly [took] into account the prime contractor's obligations under the prime contract." *Id.* Put differently, the subcontract's notice requirements were designed to allow the prime contractor to receive notice of the claim from the subcontractor in time to provide timely notice to the owner. *Id.* Therefore, the court required strict compliance with the subcontract's notice provision so that the prime contractor could timely provide notice to the owner. *Id.* Accordingly, the court affirmed summary judgment for the contractor based on the subcontractor's failure to follow the subcontract's notice requirements.

Like the subcontractor in *Associated Mechanical Contractors,* Duncan failed to comply with the Subcontract's notice provisions. Duncan waived its claims related to the bell restraints, excavation, and remobilization by failing to timely provide notice of the alleged change in accordance with the Subcontract. Duncan knew of these claims no later than September 2009. [Duncan Dep. 132:19-133:5]. Nonetheless, Duncan first submitted a written claim for the bell restraints in May 2010, for the excavation in July 2010, and for the remobilization in October 2010. By the time Duncan submitted its claims the work was almost 100% complete. [Duncan Dep. Ex. 4/Ex. F hereto; Duncan Dep.133:17-23].

Duncan's only justification for the untimely notice was that it needed additional time to obtain Subcontract documents in order to prepare its claim. [Duncan Dep. 134:3-135:13]. Even assuming this justification excuses the late submission of the full claim amount, it does not excuse Duncan's complete failure to provide written notice of any type within the time limits established by the Subcontract.

Duncan has implied that Walbridge did not comply with the contract change provision because Walbridge did not give Duncan a quote for the changed work. Article VII of the Subcontract states that where Duncan fails to submit a quotation within 14 days as required under the Subcontract, then Walbridge "shall prepare a quotation with respect to the changed work proposing an estimated amount for the increase or decrease in the Subcontract Price for the changed work, and Subcontractor shall be bound by such estimate and shall be deemed to have waived any right to propose a different amount." [Duncan Dep. Ex. 1 - Article VII/Ex. D hereto]. Duncan's argument is flawed. First Walbridge did not receive written notice of the claim until May, 2010, and therefore could not have provided a written response prior to that date. [Duncan Dep. 17-23; Duncan Dep. Ex. 22/Ex. K hereto]. Second, Walbridge denied the claim, in writing,

12

because it did not believe the work was a change to Duncan's Subcontract and because Duncan failed to follow the Subcontractor procedures for submitting the claim. [Walker Dep. Ex. 29/Ex. G hereto]. In fact, Duncan acknowledges that Walbridge did not consider the bell restraints or excavation or remobilization work a change. [Duncan Dep. 87:15-22; 90:1-7]. Accordingly, Walbridge would not have provided a quotation for the cost of the work because Walbridge did not consider the work as being a change to the Subcontract.

Further, as in *Associated Mechanical Contractors,* Duncan's delay in submitting notice to Walbridge prevented Walbridge from timely submitting notice of the alleged change to the United States. Therefore, this Court should grant summary judgment dismissing Duncan's claims related to the bell restraints.

### D. Duncan contractually waived its claims for excessive excavation and lost production

Duncan waived its claims for loss of production and excessive excavation and mobilization/demobilization by signing the Subcontract. Article V of the Subcontract states "[Duncan] shall not be entitled to receive any amount for overhead or profit or for any inefficiencies or loss of productivity and shall not assert any claim for overhead or profit or damages due to loss of productivity or inefficiencies." [Duncan Dep. Ex. 1 – Article V, second paragraph/Ex. D hereto]. Despite signing this provision waiving its rights to damages for inefficiencies and loss or productivity, Duncan asserted claims for loss of productivity and inefficiencies in its Complaint. [Compl. ¶¶ 19, 26, & 33].

Parties are free to contractually waive numerous and substantial rights. *Cleveland Motor Cars, Inc. v. Bank of America, N.A.*, 295 Ga. App. 100, 670 S.E.2d 892 (2008); *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776, 787 (2003) (stating that "the parties are generally free to agree to whatever they like, and, in most circumstances, it is beyond the

authority of the courts to interfere with the parties' agreement"). Similar contractual provisions waiving loss of productivity and inefficiency claims have been upheld. *See, Quinn Construction, Inc. v. Skanska USA Building, Inc.*, 730 F.Supp.2d 401, 404-05 (E.D. Penn. 2010) (enforcing provision precluding damages for acceleration caused by inefficiencies incurred by a subcontractor).

Duncan's claims for loss or production and mobilization/demobilization represent loss of productivity and inefficiency claims that are precluded under the Subcontract's terms. In addition to the Complaint's allegations claiming damages for loss of productivity, Duncan's loss of production and excessive excavation claim lists "Loss of Productivity" as an element. [Duncan Dep. Ex. 4 – Item J p. 2, ¶ 11/Ex. F hereto]. And, while the claim includes other elements that are not titled "loss of productivity" or "inefficiency", Duncan's use of the measured mile for computing damages for its loss of production and excessive excavation claim conclusively determines that the claim is a claim for loss of productivity and inefficiency. [*see* Duncan Dep. Ex. 4 – Item J p. 2, ¶¶ 8, 9/Ex. F hereto]. The "measured mile" is a damages measure used exclusively to measure loss of productivity damages. *See, Southern Comfort v. United States*, 67 Fed. Cl. 124, 147-48 (Fed. Cl. 2005) (the measured mile provides a measure for loss of productivity by "analyzing a period of unimpacted work against a period of impacted work."); *see also, Greenmoor, Inc. v. Travelers Cas. and Sur. Co. of America*, No. 06-cv-0234, 2009 WL 4730233 (W.D. Penn. Dec. 4, 2009).

In Duncan's claim for equitable relief, Duncan computed its damages for loss of production and excessive excavation claim by comparing an unimpacted portion of work, Road J, to the impacted portions. [Duncan Dep. Ex. 4/Ex. F hereto]. Because both the underlying elements of Duncan's loss of production claim are productivity elements and Duncan measured

its damages using a productivity analysis, Duncan's loss of production and excessive excavation claim is a claim for loss of productivity and inefficiency.  As such, this claim is precluded under the Subcontract's terms.  [Duncan Dep. Ex. 1/Ex. D hereto].  Accordingly, this Court should grant summary judgment dismissing Duncan's claims for loss of production and excessive excavation.

When Duncan submitted its expert report in April 2012, it changed the title of its claim from Loss of Production and Excessive Excavation to a claim for additional excavation. [Duncan Dep. Ex. 4/Ex. F hereto; Plaintiff's Rule 26(a)(2)(B) Expert Disclosures pgs. 11-12].  It is apparent that it did this because it realized that it had waived claims for loss of productivity under the Subcontract.  [Duncan Dep. Ex. 1 – Article 5/Ex. D hereto].  If this is a new claim, then certainly it is barred under the terms of the Subcontract, because it is untimely.  If, however, it is the same claim, then merely renaming it is not sufficient to get around the express terms of the Subcontract, which waives claims for loss of productivity.

Finally, the Subcontract precludes Duncan's claim for mobilization/demobilization. Duncan's claim for mobilization/demobilization arose from damages allegedly suffered by Duncan as a result of excessive and inefficient crew mobilization/demobilization.  [Duncan Dep. Ex. 4/Ex. F hereto].  According to Duncan, the inefficient moving of crews around the jobsite caused these additional costs.  [Duncan Dep. 145:19-22].  In fact, Duncan characterized these damages as claims for inefficiencies.  [Duncan Dep. 147:1-4].  Again, because the mobilization/demobilization claim is for lost productivity and inefficiency, the claim is barred by the Subcontract terms.  This Court should grant summary judgment dismissing Duncan's claims for mobilization/demobilization.

### E. Duncan's Claim for Conversion Lacks Critical Elements Required for Recovery

While the Subcontract is governed by Michigan law, Georgia law governs Duncan's conversion claim. *See Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139-40 (11th Cir. 2005). A federal court sitting in diversity will apply the choice-of-law and conflict-of-law rules for the state in which it sits. *See id.* (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Georgia's conflict-of-law rule applies *lex loci delecti*, i.e., the law of the place where the tort was allegedly committed governs. *Young v. W.S. Badcock Corp.*, 222 Ga. App. 218, 474 S.E.2d 87, 88 (1996).

When a contractual choice-of-law provision is at issue, the court will look to the provision's language to determine what claims are covered. *Baxter v. Fairfield Fin. Services, Inc.*, 307 Ga. App. 286, 704 S.E.2d 423, 428-29 (2010). Choice of law provisions will encompass tort claims only where the contractual provision's intent is to cover any and all claims arising out of the relationship between the parties. *See Young*, 474 S.E.2d at 88. Thus, the wording of the Subcontract's choice-of-law provision will determine whether Georgia or Michigan law applies to the conversion claim.

The Subcontract provides that "[t]his Subcontract shall be governed by the laws of the State of Michigan…." [Duncan Dep. Ex. 1 - Article XXVIII(k)/Ex. D hereto]. Addressing a nearly identical choice of law provision, the Georgia Court of Appeals found that the provision did not cover tort claims because the provision did not state that it covered any and all claims arising from the parties' relationship. *See Young,* 474 S.E.2d at 88 (limiting a choice of law provision to contractual claims only when that provision stated "[t]his Agreement and the terms hereof shall be governed by and construed in accordance with the laws of the State of Florida"). Like the provision in *Young*, the Subcontract's choice of law provision only governs claims

16

arising under the Subcontract, making it inapplicable to tort claims. Therefore, because the alleged tort occurred in Georgia, Georgia law governs.

Georgia law requires four elements for conversion. *See Trey Inman & Associates, P.C. v. Bank of America, N.A.*, 306 Ga. App. 451, 702 S.E.2d 711, 716 (2010). In order to recover, the complaining party must show "(1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." *Id.* at 716.

Duncan's claim for conversion is based solely on a John Deere 544J that is currently in Duncan's possession. [Duncan Dep. 147:9-24]. It is undisputed that Duncan never demanded that the property be returned. [Duncan Dep. 148:16-149:8]. There is also no evidence that Walbridge ever refused to return any equipment to Duncan. [Duncan Dep. 147:9-148:8]. In fact, Duncan acknowledges that they picked up the equipment from the project site. [Duncan Dep. 149:2-8]. In sum, Duncan never demanded from Walbridge the return of its equipment, and Walbridge never refused to return it to Duncan. Thus, Duncan cannot show at least two of the four necessary elements for conversion. Accordingly, the court should grant summary judgment dismissing Duncan's claim for conversion.

### F.     Duncan's Punitive Damages Claim Lacks a Proper Tort Basis

As with the conversion claim, Georgia law governs the award of punitive damages. *See, Manuel*, 430 F.3d at 1140 (stating that Georgia follows *lex loci delicti*, meaning the substantive law of the state where the tort was committed governs). The tort underlying the punitive damages claim is for alleged conversion that occurred in Georgia. [Compl. ¶¶ 62-66]. Therefore, Georgia law determines the availability of punitive damages.

Georgia law holds that punitive damages are only available in tort actions. *See, Esprit Log and Timber Frame Homes, Inc. v. Wilcox*, 302 Ga. App. 550, 691 S.E.2d 344, 348 (2010). By extension, it "is well settled that punitive damages are not available for breach of contract claims." *ServiceMaster Co., LP v. Martin*, 252 Ga. App. 751, 556 S.E.2d 517, 523 (2001). Duncan's sole tort-based claim is for conversion. *See generally* Compl. ¶¶ 14-69. Consequently, dismissal of Duncan's sole tort claim for conversion, as requested above, would leave claims based solely on breach of contract, a situation not allowed under Georgia law. Therefore, this Court should grant summary judgment dismissing Duncan's claim for punitive damages.

### G.     The Federal Prompt Payment Act does not Provide for a Private Right of Action Against Walbridge

Duncan alleges violations of the Prompt Payment Act against Walbridge. 31 U.S.C. §§ 3901 *et seq*. The Prompt Payment Act was created to "provide the federal government with an incentive to pay government contractors on time by requiring agencies to pay penalties – in the form of interest – on certain overdue bills." *IES Commercial, Inc. v. Continental Ins. Co., Inc.*, 814 F.Supp.2d 1 (D.C. D.C. 2011). "Neither the text of the [Prompt Payment Act] nor the legislative history reveal an intent to create a private right of action." *See id.* Courts must be cautious when recognizing a private of action and should only do so when there is a clearly-demonstrated intent to create a private right of action. *Id.* In the absence of clearly demonstrated intent "a claim does not exist and courts may not create one." *Id.* (*citing Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001)).

While the Eleventh Circuit has not addressed whether the statute creates a private right of action, other courts' "unanimous conclusion[s] that the [Prompt Payment Act] does not create a private right of action [are] nonetheless persuasive." *See id.* at 3 (citing *L & W Supply*

18

*Corporation v. Dick Corporation*, No. 3:08-cv-56, 2009 WL 1139569 at 1 (N.D. Fla. Apr. 27, 2009), *C & H Contracting of MS. LLC v. Lakeshore Engineering Services, Inc.*, No. 1:07-cv-900, 2007 WL 2461017 at 1 (S.D. Miss. Aug. 24, 2007)).  As such, the court should grant summary judgment and dismiss Duncan's Prompt Payment Act claim.

**VI.    Conclusion**

For the foregoing reasons, Defendants requests that the court grant their Motion for Summary Judgment as to (a) Duncan's claim for compensation relating to the bell restraints, (b) Duncan's claim for compensation relating to alleged additional excavation work, (c) Duncan's claim for compensation relating to mobilization and remobilization, (d) Duncan's claim for conversion, (e) Duncan's claim for punitive damages, and (f) Duncan's Prompt Pay Act claims.

Respectfully submitted this 30th day of May, 2012.

SMITH, CURRIE & HANCOCK LLP


/s/ Eric L. Nelson
Eric L. Nelson
Georgia Bar No. 537850 [Admitted Pro Hac Vice]
Joseph C. Staak
Georgia Bar No. 673712
2700 Marquis One Tower
245 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303-1227
Telephone:  (404) 521-3800
Facsimile:  (404) 688-0671

*Attorneys for Defendants Walbridge Aldinger Company, Travelers Casualty and Surety Company of America and Liberty Mutual Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that I have this 30th day of May, 2012, served a copy of the within and foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

This 30th day of May, 2012.

SMITH, CURRIE & HANCOCK LLP

/s/ Eric L. Nelson
Eric L. Nelson