IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| for the use and benefit of DUNCAN PIPELINE, | ) | |
| INC., a Georgia corporation, and DUNCAN | ) | |
| PIPELINE, INC., | ) | |
| | ) | CIVIL ACTION |
| Plaintiffs, | ) | FILE NO. 4:11-CV-00092-WTM-GRS |
| | ) | |
| vs. | ) | |
| | ) | |
| WALBRIDGE ALDINGER | ) | |
| COMPANY, a Michigan corporation; | ) | |
| TRAVELERS CASUALTY AND SURETY | ) | |
| COMPANY OF AMERICA; a Connecticut | ) | |
| corporation; and LIBERTY MUTUAL | ) | |
| INSURANCE COMPANY, a Massachusetts | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Subcontractor Duncan Pipeline, Inc. ("DPI") was directed by Walbridge Aldinger Company

("Walbridge") to perform work outside the scope of the parties' contract. DPI performed the work

and sought payment.  Walbridge, and its sureties, have refused to pay DPI for amounts from the

additional work performed by DPI, alleging that DPI has waived or released its claims.

## I.    STATEMENT OF FACTS

In July 22, 2009, DPI contracted with Walbridge to install the potable water distribution

system on a several hundred acre site at Ft. Stewart, Georgia (the "Project") pursuant to Subcontract

No. 5-1724-0205 (the "Subcontract"). (2/24/2012 W. Duncan Dep. Ex. 1/Ex. A hereto). The United

States Army Corps of Engineers (the "Corps") had hired Walbridge to be the general contractor for

several projects at Ft. Stewart, Georgia.  (Pangborn Dep. pp. 24-25, Excerpts Ex. B hereto).

During performance, DPI was verbally ordered to perform work by Walbridge that DPI contended was beyond the Subcontract scope, including extra excavation and additional bell restraints. (Webb Dep. pp. 28-29, Excerpts Ex. C hereto; W. Duncan Aff ¶¶ 4-9, 12-32 56 Ex. 1/Ex. D hereto; Walker Dep. p. 104,112-13, 118-19; /Excerpts Ex. E hereto; Pangborn Dep. p. 192-94, 201-203/Excerpts Ex. B hereto).  On numerous claims for additional compensation, Walbridge approved payment where DPI submitted its first written notice more than 30 days after performing the work.  Id.  On May 10 and 18, 2010, DPI submitted compensation requests for extra work performed related to extra excavation and bell restraints. (W. Duncan Aff. Ex. 2, 3/Ex. D hereto).

The additional bell restraint claim arises out of an August 2009 directive from Walbridge to treat in-line gate valves as dead-ends for purposes of thrust restraints.  (Webb Dep. pp. 28-29/Excerpts Ex. C hereto; W. Duncan Aff ¶¶ 4-9, 12-32 56 Ex. 1/Ex. D hereto).  After initially claiming these additional restraints were called for by Subcontract, Walbridge now concedes the requirement to treat in-line gate valves as dead ends for purposes of restraint was not "sufficiently clear or stated to remove any uncertainty or ambiguity" in the contract documents (Studdard Dep. p. 102/Excerpts Ex. E hereto).  DPI's claim for extra excavation was caused by the installation of other underground utilities out of sequence per the plans and the necessity to bury the gate valve manholes deeper because of inaccurate plans and drawings. (W. Duncan Aff. ¶ 56/Ex. D hereto).  Duncan is also entitled to additional compensation due to excessive mobilization that it incurred in moving its crews around the 300 plus acre job site at Ft. Stewart in an unanticipated manner. (Id. at 45).

Walbridge and its sureties, who are parties pursuant to the Miller Act, have refused payment for these claims for additional compensation because of DPI's execution of Partial Unconditional Waivers, DPI"s alleged failure to provide timely written notice of its claims, and various other waiver arguments.  Each of Defendants argument in its Motion fail.

## II.    ARGUMENT AND CITATION TO AUTHORITY

**A.   EXECUTED WAIVERS DO NOT LIMIT PLAINTIFFS' RECOVERY**

### 1.    Executed Waivers Do No Bar DPI's Claim Under Georgia Law

Here, the waivers were executed in Georgia by a Georgia resident related to work performed in Georgia. Therefore, construction of the partial unconditional waiver is governed by Georgia law. Hostetler v. Answerthink, Inc., 267 Ga. App. 325, 329, 599 S.E.2d 271, 275 (2004). The Subcontract's choice of law provision has no impact on the interpretation on the Waivers. Noorani v. Sugarloaf Mills L.P., 308 Ga. App. 800, 804 (2011).

*(i)    Executed Partial Unconditional Waivers Are Unenforceable*

Under Georgia law, "[n]o oral or written statement by the claimant purporting to waive, release, impair, or otherwise adversely affect a lien or bond claim is enforceable or creates an estoppel or impairment of claim of lien or claim upon a bond unless . . . It is pursuant to a waiver and release form duly executed by claimant prescribed below." O.C.G.A. § 44-14-366(b) (2012). O.C.G.A. § 44-14-366(c) prescribes the form that a valid waiver must follow, including the requirement that the waiver be "in boldface capital letters in at least 12 point font." O.C.G.A. § 44-14-366(c) (2012). O.C.G.A. § 44-14-366(c) further specifies: "The failure to include this notice language on the face of the [waiver] form shall render the form unenforceable and invalid as a waiver and release under O.C.G.A. § 44-14-366." Since the subject waivers do not follow the required language of O.C.G.A. § 44-14-366(c) and none of the waiver language is in bold or in capital letters, they are invalid under Georgia law[1] in their entirety. Farmer v. Argenta, 174 Ga. App. 682, 684, 331 S.E.2d 60, 62 (1985).

---

[1] Georgia courts will not be apply "the law of the jurisdiction chosen by parties to a contract . . . where application of the chosen law would contravene the policy of, or would be prejudicial to the interests of, this state." Convergys Corp. v. Keener, 276 Ga. 808, 810, 582 S.E.2d 84, 85-86 (2003).

(ii)     *Waivers Not for the Benefit of Defendants*

The Partial Unconditional Waivers were for the benefit of the Owner, not Walbridge. In <u>J.L. Williams & Co. v. West Concrete Co.</u>, 139 Ga. App. 208, 228 S.E. 2d 196 (1976), a concrete subcontractor brought suit against a general contractor based on breach of an oral agreement. <u>Id</u>. The concrete subcontractor had signed a waiver, wherein it agreed to "waive and release any and all lien or claim or right of lien under the Statutes of the State of Georgia relating to Mechanic's liens on the above described premises and improvements thereon . . . ." <u>Id</u>. (emphasis added). The general contractor moved for summary judgment and argued that the signed waiver barred the subcontractor's claim. <u>Id</u>. at 210. In affirming the trial court's denial of summary judgment, the Court of Appeals explained: "The waiver of lien waived plaintiff's lien rights vis-a-vis the owner, not the general contractor. The [general contractor] was not a party to that instrument." <u>Id</u>. at 210.

In <u>David Shapiro & Co. v. Timber Specialties, Inc.</u>, 141 Ga. App. 354, 233 S.E. 2d 439 (1977), the Plaintiff signed a waiver which provided: "The [plaintiff] hereby certifies that all labor and/or materials furnished or used on the above-described premises for which this waiver of lien is executed have been paid in full." <u>Id</u>. The Court held summary judgment was inappropriate becausee it was reasonable to construe the waiver as a "waiver of a lien against property and not the waiver of a third party's obligation under an open account." <u>Id</u>. at 355-56; <u>see also</u> <u>Hampshire Homes, Inc. v. Espinosa Constr. Servs.</u>, 288 Ga. App. 718, 725, 655 S.E.2d 316, 321 (2007).

Here, since the subject waivers specifically refer to the "Owner's compliance with applicable[2] Construction Lien Laws," these waivers were explicitly for the benefit of the Project's

---

Since the policy of Georgia is to require explicit disclosure, this Court, sitting, in part, in diversity, cannot enforce the non-compliant waivers. <u>See</u> <u>Garcia v. Public Health Trust</u>, 841 F.2d 1062, 1066 (11th Cir. 1988); <u>Totalplan Corp. of Am. v. Colborne</u>, 14 F.3d 824, 832 (2d Cir. 1994).

[2] Since the only "applicable Construction Lien Laws" would have been here in Georgia, <u>Thurman v. Kyle</u>, 71 Ga. 628, 630 (1883), the parties intended for Georgia law to apply.

Owner. Additionally, lien rights, which were waived in <u>J.L. Williams & Company</u> and <u>David Shapiro & Company</u> and which were purportedly waived here, are rights that a subcontractor has against the **owner** of the real property. See <u>Scott v. Williams</u>, 111 Ga. App. 735, 736, 143 S.E.2d 16, 18 (1965) ("The purpose of the lien statutes in every state is, in substance the same; this is, to give the furnisher of labor and material a claim upon the owner"). At the very least, the ambiguity regarding the intended beneficiary of the waiver creates a jury question. <u>David Shapiro & Co. v. Timber Specialties, Inc.</u>, 141 Ga. App. 354, 233 S.E. 2d 439 (1977).

Moreover, under Georgia law, "only those parties named in the release will be discharged by that instrument." <u>Keefe v. Northside Hosp.</u>, 245 Ga. App. 420, 423, 538 S.E.2d 61, 63 (2000) (citing <u>Lackey v. McDowell</u>, 262 Ga. 185, 415 S.E.2d 902 (1992)) (emphasis added). In <u>Allgood Elec. Co. v. Martin K. Eby Constr. Co.</u>, 85 F.3d 1547 (11th Cir.1996), the 11th Circuit Court of Appeals applied the <u>Lackey</u> rule[3] to a case brought by an electrical subcontractor against a general contractor who moved for summary judgment based on waiver and release language. <u>Id</u>. at 1548-49. In reversing summary judgment, the 11th Circuit held the language released "lien claims against the property, not causes of action against [the general contractor] under the subcontract." <u>Id</u>. at 1553.

Like in <u>Allgood Electric Company</u>, the fact that the subject waivers were directed to Walbridge does not change that the waivers only released "lien claims against the property, not causes of action against [Walbridge] under the subcontract." Moreover, since Liberty Mutual and Travelers are not specifically named, under the <u>Lackey</u> rule, Plaintiffs' bond claims against all Defendants, especially Travelers and Liberty Mutual, were not released by the subject waivers.

---

[3] Defendants have urged the Court to evaluate the instant waivers as a release. (Defendants' Brief, p. 7). The word "release" never appears in the Partial Unconditional Waivers. However, the 11th Circuit Court of Appeals has acknowledged "the terms 'waiver' and 'release' can be synonymous." <u>Edwards v. Kia Motors of Am., Inc.</u>, 486 F.3d 1229, 1233 (11th Cir. 2007). Therefore, Duncan agrees that the <u>Lackey</u> rule must be applied in construing the subject waivers.

      (iii)    *Partial Unconditional Waivers Do Not Unambiguously Waive DPI's Rights*

The waiver of an important contractual right will not be inferred "unless the waiver is clear and unmistakable." Floyd v. Gore, 251 Ga. App. 803, 807, 555 S.E.2d 170, 175 (2001). "Waiver is a voluntary relinquishment of some known right, benefit, or advantage, which, except for such waiver, the party otherwise would have enjoyed." Kersh v. Life & Casualty Ins. Co., 109 Ga. App. 793, 796, 137 S.E.2d 493, 496 (1964). "[A]ll ambiguities in a contract are to be resolved against" the existence of a forfeiture of contractual rights. DOT v. Dalton Paving & Constr., 227 Ga. App. 207, 215, 489 S.E.2d 329, 337 (1997).

Defendants argue the phrase "claims arising from the improvement" evinces DPI's intent to release all claims for compensation existing prior to April 20, 2010. Under the maxim *noscitur a sociis*, this phrase, "claims arising from the improvement," "must be gauged by the words surrounding it." Anderson v. Southeastern Fidelity Ins. Co., 251 Ga. 556, 307 S.E.2d 499, 500 (1983). The first two phrases in the waiver,[4] "construction lien rights, rights against any payment bonds," make clear that DPI was only waiving statutorily created rights or claims[5] of rights meant to assist the subcontractor in obtaining payment. O.C.G.A. § 44-14-360 et. seq. However, "pursuing a lien on the improved property is only one avenue available to construction subcontractors to collect on unpaid invoices; pursuing and then discarding that avenue does not eliminate the second avenue

---

[4] The April 23, 2010 Partial Unconditional Waiver provides:  I/We have a contract with Walbridge to provide contract work for 51724 the improvement of the property described as 5th BCT and hereby waive my/our construction lien rights, rights against any payment bonds, and claims arising from the improvement, in the amount of $2,469,093.65 for labor/material provided through 04/20/2010.

[5] This Court "should avoid an interpretation of a contract which renders portions of the language of the contract meaningless." ALEA London Ltd. v. Woodcock, 286 Ga. App. 572, 576, 649 S.E.2d 740, 745 (2007). Here, the first two waived items are "rights" whereas the third waived items refers to "claims." Historically, such waivers have drawn the distinctions between lien rights and claims of such rights. See J.L. Williams & Co. v. West Concrete Co., 139 Ga. App. 208, 228 S.E. 2d 196 (1976) ("waive and release any and all lien or claim or right of lien.")

of pursuing the underlying debt in a direct action against the debtor." Hampshire Homes, Inc. v.

Espinosa Constr. Servs., 288 Ga. App. 718, 725, 655 S.E.2d 316, 321 (2007).

The parties' intent to only waive statutorily created lien rights or claims of such rights is also

clearly evinced in Walbridge's use of the word "improvement." Under Georgia lien law, the word

"improvement" has special meaning. In Skandia Draperies Mfg. Co. v. Augusta Innkeepers, 157 Ga.

App. 279, 280, 277 S.E.2d 282, 283 (1981), the Georgia Court of Appeals explained: "[M]aterial for

the improvement of real estate" means "something that goes into and becomes a part of the finished

structure . . . the object of the lien statutes being to secure a lien for that which goes into the

structure." The Court found that "the draperies and spreads could not be construed *as part of the*

*realty* and thus that they did not become lienable items." Id. at 280 (emphasis added). Because

work is required for the completion of a project does not necessarily mean the work will be

considered an "improvement to the property" under Georgia's lien law. Trench Shoring Servs. of

Atlanta, Inc. v. Westchester Fire Ins. Co., 274 Ga. App. 850, 851, 619 S.E.2d 361, 363 (2005).

Therefore, in requiring a waiver, the owner of the real property is not concerned with claims that do

not arise from the "improvement," i.e., items that are not lienable. Rather, the owner is only

concerned with avoiding encumbrances or claims of encumbrances on the real property. In other

words, the inclusion of "claims" of lien or bond rights is meant to avoid the owner having to litigate

whether the subcontractor's furnishing of materials or labor became part of the real property such

that lien rights would attach. Walbridge's intentional use of the word "improvement" reiterates that

the waiver was only intended to waive statutorily created lien rights or claims of such rights, not

DPI's otherwise colorable claims for additional compensation against Defendants.

Moreover, even to the extent the phrase, "claims arising from the improvement," amounts to

a waiver of any claims, such waiver is only limited to the amount of $2,469.093.65. The amount the

7

Plaintiffs seek in this action is in addition to that amount, which reflects the money that had been paid by Defendants through April 20, 2010. The Partial Unconditional Waivers could not act as a voluntary relinquishment of a known right because such an effect would have contradicted the plain language of the Subcontract. The Subcontract provides:

> Notwithstanding any inability to agree upon any adjustment or the basis for an adjustment, Subcontractor shall, if directed by Contractor, nevertheless proceed in accordance with the order, and the Subcontract Price shall be adjusted as reasonably determined by Contractor *with any dispute to be resolved after the completion of the Work.*

Subcontract, Article VII (emphasis added).[6]

"Work" is defined as the tasks identified and described in Exhibit D to the Subcontract. Subcontract, Article I.   The parties agreed to resolve disputes regarding additional compensation once all the Subcontract work had been completed.   Therefore, DPI did not contemplate it was waiving any rights to additional compensation by signing the Partial Unconditional Waivers in order to obtain progress payments pursuant to Article III of the Subcontract. See JTE Constructors of N.C., Inc. v. United States Fid. & Guar. Co., 2003 U.S. Dist. LEXIS 22301 (M.D.N.C. Nov. 25, 2003).

  (iv)    *Georgia Cases Relied Upon By Defendants Are Inapposite*

Citadel Corp. v. Sun Chem. Corp., 212 Ga. App. 875, 443 S.E.2d 489 (1994), which is one of the two Georgia cases cited by Defendants on the subject, is inapposite here. The scope of the release in Citadel Corporation is drastically broader than the phrase, "claims arising from the improvement." Specifically, the release language at issue there explicitly said that Plaintiff releases all claims "for additional compensation under this contract, including without limitation any rights contractor may have for additional compensation arising out of delays or disruption of contractor's schedule as may

---

  [6] Under Georgia and Michigan law, ambiguous contract provisions are construed against the drafter. ADI Fin. Servs. v. City of Atlanta, 310 Ga. App. 700, 704,  714 S.E.2d 270, 273 (2011); Petersen v. Magna Corp., 484 Mich. 300, 312,  773 N.W.2d 564, 570 (2009).

have arisen prior to the date of this modification." Citadel Corp. v. Sun Chem. Corp., 212 Ga. App. 875, 443 S.E.2d 489 (1994). The Partial Unconditional Waivers do not contain similarly explicit language which evince an intent by DPI to release its claims for additional compensation. Moreover, the 11th Circuit has distinguished Warrior Constructors, Inc. v. E. C. Ernst Co., 127 Ga. App. 839, 195 S.E.2d 261 (Ga. Ct. App. 1973), another case relied upon Defendants, in Allgood Elec. Co. v. Martin K. Eby Constr. Co., 85 F.3d 1547, 1553 (11th Cir. 1996), explaining "a release 'from any and all claims of every nature arising under or by virtue of said subcontract,' is obviously much broader in scope than a waiver of 'all claim or rights of lien … upon the premises.'"

### 2.   Partial Unconditional Waivers Irrelevant Under Michigan Law

If the Court concludes Michigan law applies to the subject waivers, the Court must conclude that these waivers are completely irrelevant. The Michigan Court of Appeals construed an identical Partial Unconditional Waiver in Interior v. Devon Indus. Group, 2009 Mich. App. LEXIS 299 (Mich. Ct. App. Jan. 8, 2009).[7] The Defendants moved for partial summary judgment, asserting that Plaintiff had signed a "partial unconditional waiver of lien" that entitled defendants to dismissal of Plaintiff's claims that related to any work completed prior to March 31, 2004. Id. at 1-2. In affirming the trial court's denial of partial summary judgment, the Michigan Court of Appeals explained, by citing MCLS § 570.1115, that such a partial unconditional waiver was "statutorily derived and only relates to construction lien claims," specifically noting that "the phrase 'claims arising from the improvement' can reasonably be viewed as only addressing construction lien claims." Id. at 11-12. The Michigan Court of Appeals explicitly held that since the Partial

---

[7] When considering similar Michigan unpublished opinions, the Sixth Circuit Court of Appeals has noted its "overarching duty to ensure that we correctly apply Michigan law." Bennett v. MIS Corp., 607 F.3d 1076, 1096 (6th Cir. Mich. 2010) Interior "provides persuasive evidence" of how Michigan courts would construe the precise waiver at question in this case. Id.

Unconditional Waiver, like the one here, "waived only construction lien rights," it should be completely excluded from the trial of the plaintiff's breach of contract claim. Id. at 13.

The Defendants here make the same argument that was rejected in Interior, to wit: "the phrase, 'claims arising from the improvement' [precludes] all plaintiff's claims through [April 20, 2010]." Id. at 11. To the extent Michigan law applies and Walbridge desired construction liens to be waived, Walbridge had to use the form prescribed by MCLS § 570.1115(9). A failure to do so would have resulted in an ineffective lien waiver. If the phrase, "claims arising from the improvement," involved more than the waiver of construction liens it would either violate MCLS § 570.1302, which precludes a construction of the Construction Lien Act that prevents "a lien claimant from maintaining a separate action on a contract" or MCLS § 570.1115(9), which prescribes a lien waiver form that does not include substantially similar language. In other words, if the phrase, "claims arising from the improvement," does not relate to the waiver of claims arising out of lien rights, the form would not be in compliance with MCLS § 570.1302. Under Michigan law, the subject Partial Unconditional Waivers only related to the waiver of rights and claims arising from Michigan's Construction Lien Act. See also Old Kent Bank of Kalamazoo v. Delisle, 222 Mich. App. 436, 438-440 (1997) ("A construction lien, like a mechanic's lien, is not a substitute for a debt but is only a security interest given to facilitate the satisfaction of the debt.")

### 3.    DPI Has Not Waived Miller Act Rights

When determining whether a subcontractor has waived its Miller Act rights, the 11th Circuit Court of Appeals has held:

> The right to sue on a surety bond is a right created by statute, and in the absence of a novation or clear expression to the contrary, the contention that there has been a waiver or release of that right must fail. Thus, absent a novation, waiver, estoppel, or other *clear and explicit* relinquishment of the statutory right, a supplier is entitled to pursue payment under a bond.

Trane Co., Div. of American Standard, Inc. v. Whitehurst-Lassen Constr. Co., 881 F.2d 996, 1002 (11th Cir. 1989) (citations omitted) (emphasis added).

The 11th Circuit has also explained that "[w]aiver requires (1) the existence at the time of the waiver a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit." In re Garfinkle, 672 F.2d 1340, 1347 (11th Cir. 1982). As of April 20, 2010, the date of the last waiver, DPI had not completed its work on the Project. (5/4/2012 W. Duncan Dep. p 58:4-12/Excerpts Ex. G hereto). Therefore, DPI's Miller Act rights had not come into being since such rights do not ripen until a subcontractor "has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made." 40 USCS § 3133(b) (2012); See also United States use of Atkins v. Reiten, 313 F.2d 673, 674 (9th Cir. 1963). Therefore, the subject forms[8] were not "clear and explicit" waivers of DPI's Miller Act rights, which were not yet in existence.

### 4. Compensation For Work Completed after April 20, 2010

Even if the Court finds that the Partial Unconditional Waivers are enforceable against DPI related to its claims against Defendants, there is a question for the jury as to when this work was completed relative to April 20, 2012. Specifically, DPI completed its work that composes its additional bell restraint claim in June 2010, its extra excavation claim in May 2010, and its mobilization claim in June 2010. (5/4/12 W. Duncan Dep. p. 58/Excerpts Ex. G hereto; W. Duncan Aff. ¶ 48/Ex. D hereto). Since some of the work which makes up Plaintiffs' claims for which summary judgment is sought arose after April 20, 2010, a factual question exists as to these claims regardless of the Court's construction of the subject Partial Unconditional Waivers.

---

[8] The subject waivers use of the term, "payment bonds," refers to bonds that are prescribed in O.C.G.A. § 44-14-364 or MCLS § 570.1116.

**D.     NOTICE OF PLAINTIFFS' CLAIM WAS TIMELY**

**1.     DPI Complied with Contractual Notice Obligation**

Article II of the Subcontract provides: "The Subcontractor shall promptly give written notice of any claim for adjustment of the Subcontract Price under this Article *within the time limits provided in this Subcontract* and within such time to permit the Contractor to comply with the requirements of the Agreement Between Owner and Contractor." (2/24/2012 W. Duncan Dep. Ex. 1/Ex. A hereto).(emphasis added).  However, there are only two[9] potential sources for "time limits provided in the Subcontract," Article VII[10] or 48 CFR 52.243-4.  While DPI contends that the evidence shows it complied with these provisions as a matter of law, at the very least, a factual question exists regarding DPI's compliance with the Subcontract's notice requirements.

*(i)     Article VII Is Irrelevant to Meaning of Article II*

Contrary to Defendants' contention, Article VII does not provide "time limits" to "give written notice of any claim for adjustment of the Subcontract Price."  Specifically, Article VII provides in pertinent part:

> ARTICLE VII - CHANGES:  Contractor may, without invalidating the Subcontract or any bond given hereunder, order extra and/or additional work, deletions, or other modifications to the Work, such changes to be effective only upon written order of Contractor. . . . Notwithstanding any inability to agree upon any adjustment or the basis for an adjustment, Subcontractor shall, if directed by Contractor, nevertheless proceed in accordance with the order, and the Subcontract Price shall be adjusted as reasonably determined by Contractor with any dispute to be resolved after the

---

[9] To the extent Defendants rely on language in Walbridge's agreement with the Corps, any such contract has not been included in the summary judgment record and cannot be considered.  Allgood Elec. Co. v. Martin K. Eby Constr. Co., 85 F.3d 1547, 1554 (11th Cir. 1996).  Moreover, such general incorporation by reference, of the terms of the principal contract, refers only to "the quality and manner of the subcontractor's work, not the rights and remedies he may have against the prime contractor." United States use of T/N Plumbing & Heating Co. v. Fryd Constr. Corp., 423 F.2d 980, 983 (5th Cir. 1970).

[10] In its moving brief, Defendants only rely on Article VII in interpreting the meaning of Article II. (Defendants Moving Brief p. 10).  This argument, however, ignores FAR 52.243-4, which is clearly incorporated into the Subcontract through Exhibit F.

completion of the Work. . . . The Subcontractor shall not receive payment for additional work or work that deviates from the Drawings and Specifications performed without a written authorization from the Contractor.

Within fourteen (14) days of receipt of direction to perform changed work, and in any event within the time permitted by the Agreement Between Owner and Contractor for submission of quotations to the Owner, Subcontractor shall submit to Contractor one (1) original and six (6) copies of its quotation proposing the increase or decrease in the Subcontract Price for the changed work. . . .

In the event that the Subcontractor fails to submit a quotation within the time limits set forth in this Article VII, the Contractor shall prepare a quotation with respect to the changed work proposing an estimated amount for the increase or decrease in the Subcontract Price for the changed work, and Subcontractor shall be bound by such estimate and shall be deemed to have waived any right to propose a different amount.

(2/24/2012 W. Duncan Dep. Ex. 1/Ex. A hereto).

Rather that providing for "time limits" to "give written notice of any claim for adjustment of the Subcontract Price," the only "time limits" placed on DPI by Article VII is a limitation on time to submit "quotations" for work directed that was outside the Subcontract scope. However, DPI's failure to submit "quotations" within 14 days would not preclude its claim, but rather bar it from proposing an amount for the changed work different than that prepared by Walbridge.[11] In fact, the only obligation in Article VII to provide information in writing was placed on Walbridge to provide a Subcontractor with a "written order" or "written authorization."[12]

(ii)      *Actual Notice is Sufficient Under 48 CFR 52.243-4*

Understanding that this Court should avoid a construction of the phrase, "within the time limits provided in this Subcontract," in Article II that would render it meaningless, the only other

---

[11] Under the facts and law present in this litigation, Duncan does not concede that it would not be bound by any amount that Defendants would now quote for this additional work.

[12] John Walker testified, regarding his understanding of the difference between "written order" and "written authorization" in Article VII, "that could be taken a lot of different ways" and he did not know whether "written order" and "written authorization" meant the same thing. (Walker Dep. 113-14/Excerpts Ex. E hereto).

potential source of "time limits" is found in Exhibit F of the Subcontract, Item Number Nine (9),

which incorporates Federal Acquisition Regulation ("FAR") Clause 52.243-4 into the Subcontract.

FAR Clause 52.243-4 provides in pertinent part:

> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.
>
> (e) The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause or (2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of proposal, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) above.

48 CFR 52.243-4 (2012).

Where a federal regulation is incorporated into a contract, courts are to look to federal

common law to interpret such provisions. Linan-Faye Constr. Co. v. Housing Auth., 49 F.3d 915,

922 (3d Cir. 1995); Brinderson Corp. v. Hampton Rds. Sanitation Dist., 825 F.2d 41, 44 (4th Cir.

1987); GMC v. Northrop Corp., 685 N.E.2d 127, 134 (Ind. Ct. App. 1997); Westinghouse Electric

Corp. v. Garrett Corp., 437 F. Supp. 1301, 1329 (D. Md. 1977) aff'd, 601 F.2d 155 (4th Cir. 1979).

In applying FAR 52.243-4, the United States Court of Federal Claims has recently explained:

> Although the changes clause describes a twenty-day time limit for providing notice to the contracting agency, the general rule described in the case law for evaluating compliance with the clause's notice requirement is more flexible: Written notice as to constructive changes must be supplied by the contractor before such time that the Government would suffer if not apprised of the facts. Thus, if the contracting officials have *knowledge of the facts or problems that form the basis of a claim and are able to perform necessary fact-finding and decisionmaking, the Government is*

> *not prejudiced by the contractor's failure to submit a precise claim at the time a constructive change occurs.*

K-Con Bldg. Sys. v. United States, 100 Fed. Cl. 8, 30 (Fed. Cl. 2011) (internal quotations and citations omitted) (emphasis added).

      Here, Chris Roethemeyer, Walbridge's quality control for the water distribution system, testified that he thought treating the in-line gate valves as "dead-ends" for purposes of thrust restraint was an "additional costs" to DPI and he told John Walker, Walbridge's Project Manager, that "additional cost" should be submitted to the Corps. (Roethemeyer Dep. p. 72-74/Excerpts Ex. H hereto).  Rhonda Reed, who was identified in the Subcontract as the Project Manager, testified that in August 19, 2010 Walbridge was "looking into" the bell restraint issue.  (Reed Dep. p. 50-52/Excerpts Ex. I hereto).  In fact, Walbridge's daily report to the Corps on August 19, 2009 states: "There was discussion on the water dist. piping requiring the valves to be treated as a dead end, which will involve added restraints. Contractor currently researching issue." (Reed Dep. Ex. 3/Ex. J hereto).  John Walker, Walbridge's acting[13] Project Manager, testified "things were looked at about the bell restraints." (Walker Dep. p. 154/Excerpts Ex. E hereto).

      Additionally, Ward Duncan testifies that he made Walbridge aware of DPI's claims related to the bell restraints and the requirement to excavate deeper because of the gate valve vaults in August 2009. (W. Duncan ¶¶ 4-9/Ex. D hereto). Gary Webb, Walbridge's Project Executive, testified that at this same meeting he told DPI to perform the work or leave the Ft. Stewart job. (Webb Dep. p. 28-29/Excerpts Ex. C hereto).  In August 2009, Walbridge clearly had *"knowledge of the facts or problems that form the basis of [DPI's] claim and [were] able to perform necessary fact-finding and decisionmaking."* K-Con Bldg. Sys. v. United States, 100 Fed. Cl. 8, 30 (Fed. Cl. 2011); see also

---

[13] Neither Walker and Reed could explain why Reed was named as Project Manager. (Reed Dep. p. 96-97/Excerpts Ex. I hereto; Walker Dep. p 114-15/Excerpts Ex. E hereto). his discrepancy forms an additional basis for Walbridge having waived the written notice requirement.

Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1392 (Fed. Cir. 1987) ("the existence of prejudice resulting from the dilatory notice" . . . does not bar in its claim entirely.)

(iii)     <em>No Time Limit for Written Notice Since Specifications Were Defective</em>

The 20 day written notice[14] requirement does not apply to a request for equitable adjustment[15] which is "based on defective specifications."  48 CFR 52.243-4 (2012).  Here, Plaintiffs' claims for equitable adjustment are "based on defective specifications."

The case of ACE Constructors, Inc. v. United States, 499 F.3d 1357 (Fed. Cir. 2007) is on directly point on the meaning of "defective specifications."  There, Ace Constructors, Inc. entered into a contract with the Corps to build a structure at Fort Bliss in Texas.  Id. at 1359-1360.  During performance of its contract, the Corps required a certain, more expensive type of concrete paving testing that ACE had not include in its bid.  Id. at 1360-61.  After a trial, the Court of Federal Claims ordered an equitable adjustment based on the Corps' requiring the more expensive type of concrete paving testing.  Id. at 1360.  The Federal Circuit affirmed the trial court's grant of an equitable adjustment on "the defective specification ground," relying on the trial court's factual determination that "ACE reasonably concluded that profilographic testing was not required by the contract, and that the Army's insistence on this requirement, until it was found to be inappropriate, warranted compensation for the additional costs incurred."  Id. at 1362-63;  See also Blount Bros. Constr. Co. v. United States, 171 Ct. Cl. 478, 496 (Ct. Cl. 1965) (Contractors "are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents, and they are protected if they innocently construe in their own favor an ambiguity equally susceptible to another construction.");  White v. Edsall Constr. Co., 296 F.3d 1081, 1087 (Fed. Cir. 2002).

---

[14] Even if Article VII provides "time limits," those time limits would not apply if the Court makes a finding of "defective specifications" due to Subcontract's incorporation of 48 CFR 52.243-4.

[15] The Subcontract allowed Duncan to recover equitable adjustments. Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc., 532 F.3d 1063, 1077 (10th Cir. 2008).

As in ACE Constructors, Inc., DPI reasonably concluded that in-line gate valves were not to be treated as dead-ends for purposes of thrust restraint. Just as the Corps' insistence on profilographic testing in ACE Constructors, Inc. was a basis for recovery based on defective specifications, the Walbridge's insistence on additional restraints for in-line gate valves supports a claim for equitable adjustment due to defective specifications. (2/24/2012 W. Duncan Dep. p. 82-84/Excerpts Ex. K). There was no requirement that DPI submit written notice to Walbridge since its bell restraint claims was based on defective specifications. See 48 CFR 52.243-4(d) (2012).

Similarly, the basis for DPI's claim for equitable adjustment for extra excavation is based on DPI having to bury the pipe deeper than 36 inches. (5/4/2012 W. Duncan Dep. p. 24-25/Excerpts Ex. G hereto). When DPI began performing the contract, certain manholes were too high if the pipe was only buried at 36 inches of cover. (Id. at 40-41). This result clearly breached Walbridge's "implied warranty that if the specifications are followed an acceptable result will be produced." Fireman's Fund Ins. Co. v. United States, 92 Fed. Cl. 598 (Fed. Cl. 2010). Moreover, Plaintiffs' expert testified it was a reasonable conclusion for DPI to bid the job based on 36 inches of cover. (Rindt Dep. p. 41-42/Excerpts Ex. L hereto). The drawings are "misleading" "from a visual point of view." (Id.). Like the bell restraint issue, DPI's claim is based, in part, on defective specifications.

Defendants now[16] concede the requirement to treat in-line gate valves as dead ends for purposes of restraint was not "sufficiently clear or stated to remove any uncertainty or ambiguity." (Studdard Dep. p. 102/Excerpts Ex. F hereto). In fact, like in ACE Constructors, Inc., Walbridge ultimately allowed Terry Lee Contracting, the Force Main subcontractor, to alter its thrust restraints

---

[16] Initially, Walbridge argued that an equitable adjustment was not allowed because the Bell Restraints were "clearly a matter contained within [DPI's] contract documents." (Walker Dep. Ex. 29/Ex. M hereto). Defendants' expert now contends that DPI should not receive equitable adjustment because DPI failed to seek pre-bid clarification regarding whether additional bell restraints were required. (Studdard Dep. p. 102-03/Ex. F hereto).

requirements that were originally based on the same specifications that DPI protested as not requiring additional thrust restraints. (Pangborn Dep. p. 169-175/Ex. B hereto; Reed Dep. p. 69-74/Excerpts Ex. I hereto). As in <u>Blount Brothers Construction Company</u>, DPI was not "expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents." <u>Id.</u> at 496-97.

Since there is a question of fact[17] as to whether DPI is entitled to equitable adjustments due to defective specifications[18] and there are no time limits in which DPI had to submit written notice forclaims arising out of "defective specifications," summary judgment is inappropriate.

     *(iv)*    *Time Limit Under 48 CFR 52.243-4 Extended*

Pursuant to 48 CFR 52.243-4(d), the period within which to submit a claim for equitable adjustment can be "extended." Here, Walbridge, extended that period as it relates to the bell restraints.[19] Specifically, on September 15, 2010, Walker wrote:

> With regard to your Request for Equitable Adjustment in connection with the Bell Restraints, please note that we will not submit your Request to the Government at this time. . . . However, if you wish to continue pursuit of this Request for Equitable Adjustment, you must properly certify the claim to us so that we are able to state in good faith that your supporting data is accurate and complete, and that the amount your request accurately reflects a contract adjustment for which we believe the Government is liable. . . .

(Walker Dep. Ex. 29/Ex. M hereto).

---

[17] Since Defendants have specifically stated they are not placing at issue in this Motion for Summary Judgment whether the additional work performed by Duncan was part of the scope of the Subcontract, Defendants are now precluded from arguing that "defective specifications" do not exist here as a matter of law. (Defendants' Moving Brief, p. 5).

[18] In the alternative to "defective specifications," Duncan's claim for equitable adjustment is based on constructive changes ordered by Walbridge. See generally Ronald Adams Contr. v. United States, 60 Fed. Appx. 315, 316 (Fed. Cir. 2003).

[19] Additionally, written notice regarding the extra depth and bell restraints was provided on May 10 and 18, 2010, respectively. (W. Duncan Aff. 2, 3/Ex. D hereto). Duncan completed its work that comprises its additional bell restraint claim in June 2010. (5/4/2012 W. Duncan Dep. 58:4-6/Excerpts Ex. G hereto). Pursuant 48 CFR 52.243-4(d), Walbridge undisputedly received timely written notice regarding all bell restraints installed between April 28, 2010 and June 2010 and of the extra depth between April 20 and May 2010. Therefore, summary judgment is inappropriate.

Regarding this letter, Walker testified: "I was saying [DPI] could turn it back in and I will review it." (Walker Dep. P. 167-68/Ex. E hereto). This letter demonstrates that Walbridge was not prejudiced by any delay by DPI to submit a claim since Walbridge agreed to still certify the issue to the Corps in September 2010. See T. Brown Constructors v. Pena, 132 F.3d 724, 733 (Fed. Cir. 1997) (The existence of prejudice resulting from late notice does not bar a claim in its entirely.)

## 2.    **Walbridge Waived Written Notice Requirement**

Under Michigan and Georgia law, a written notice requirement can be waived by course of conduct.  Vandervliet v. Standard Acc. Ins. Co., 209 Mich. 146, 151,  176 N.W. 574, 576 (Mich. 1920); Boddy Constr. Co. v. Michigan DOT, 2003 Mich. App. LEXIS 541, 2-3 (Mich. Ct. App. Feb. 28, 2003); M. Rumely & Co. v. Emmons, 85 Mich. 511 (Mich. 1891); Biltmore Constr. Co. v. Tri-State Electrical Contractors, Inc., 137 Ga. App. 504, 506,  224 S.E.2d 487, 488 (1976); Circle Y Constr., Inc. v. WRH Realty Servs., 721 F. Supp. 2d 1272, 1279 (N.D. Ga. 2010) aff'd 427 Fed. Appx. 772 (11th Cir. 2011).  Waiver of a written notice requirement is a jury question.  Reinhardt v. Bennett, 45 Mich. App. 18, 27, 205 N.W.2d 847, 852 (Mich. Ct. App. 1973); Estate of Reed v. Reed, 293 Mich. App. 168, 177, 810 N.W.2d 284, 290 (Mich. Ct. App. 2011); Allos Mkt. v. Hilanto, 2009 Mich. App. LEXIS 1958 (Mich. Ct. App. Sept. 24, 2009); Cascade Electric Co. v. Rice, 70 Mich. App. 420, 424-425 (Mich. Ct. App. 1976); Biltmore Constr. Co., 137 Ga. App. at 508.   Here, Walbridge waived any requirement that DPI provide written notice of a claim.

While DPI contends Article VII does not provide "time limits" as that phrase is used in Article II, even if it does, the evidence in this case is that Walbridge routinely ignored these provisions, ordering work verbally,[20] waiting more than 14 days for DPI to submit quotations, and

---

[20] Article VII regarding written authorization is direct conflict with 48 CFR 52.243-4(b), which is incorporated by reference into the Subcontract, which allows for contract adjustment based on verbal orders.  Especially in light of Walbridge's course of conduct, this conflict between the

subsequently approving payment for that work. (Walker Dep. p. 104,112-13, 118-19; /Excerpts Ex. E hereto; Pangborn Dep. p. 192-94, 201-203/Excerpts Ex. B hereto; W. Duncan ¶¶ 12-32, Ex. 1/Ex. D hereto). Therefore, to the extent that Defendants are relying on Article VII, a fact question exists as to whether Walbridge waived these provisions.

Additionally, if the Court finds that DPI was required to strictly adhere to the written notice requirements of 48 CFR 52.243-4, that requirement was also waived. On at least three occasions, DPI began performing work outside the Subcontract scope, based on oral direction, wherein neither Duncan nor Walbridge exchanged written notice or quotes for such extra work within 30 days of the work beginning. (W. Duncan Aff. ¶¶ 17,19, 22-23, 25, 27-28, 30/ Ex. D hereto). In each of those cases, Walbridge ultimately approved a change order for such extra work. (W. Duncan ¶¶ 20, 26,31, Ex. 1/Ex. D hereto; Walker Dep. 118-19/Excerpts Ex. E hereto). Therefore, even if 48 CFR 52.243-4 is strictly construed, sufficient evidence exists to create a jury question regarding Walbridge's waiver of the written notice requirement.

**E.   DPI HAS NOT WAIVED ANY CLAIMS PURSUANT TO ARTICLE V**

**1.   Extra Excavation Claim is Not Loss of Productivity or Inefficiency Claim**

On July 23, 2010, DPI submitted[21] a Request for Equitable Adjustment, wherein DPI specifically noted that its request was caused, in part, by "communication, underground electrical and gas lines [being] installed before the water systems." (W. Duncan Aff. Ex. 6, p. 1/Ex. D hereto). In turn, "Duncan Pipeline was required to manipulate through and under newly installed utilities; [sic] sometimes at depths ranging from 9 ft to 22 ft." (Id. at p. 1). Similarly, DPI notified Walbridge

provisions should construed against the drafter, Walbridge. Moreover, under both Michigan and Georgia law, any ambiguity not resolved by rules of construction creates a jury question. Klapp v. United Ins. Group Agency, Inc., 663 N.W.2d 447, 453-454 (Mich. 2003); ESI Cos. v. Fulton County, 271 Ga. App. 181, 183 (2004).

[21] As allowed pursuant to 48 CFR 52.243-4, Duncan had previously provided written notice of its claim. (W. Duncan Aff. ¶¶ 37, 41, Ex. 2, 4/Ex. D hereto).

about the gate valve manholes, writing: "The alignment and grade of water in unusual conditions such as substantial departure from stated minimums is indeed departure from normal conditions and should be addressed by profiles with elevations to top of structures." (Id. at 2). DPI explained: "The items that dictated depths, that were not profiled on plans are ditches, slopes, pit elevations, and other utilities." (Id. at 3). DPI had bid the project with the expectation of a minimum cover of 36 inches. (5/4/2012 W. Duncan Dep. p. 24-25/Excerpts Ex. G hereto).

DPI's present claim for equitable adjustment is related to having to dig deeper and cover pipe with more than 36 inches of dirt because of utility conflicts created by Walbridge's coordination activities and because of the defective nature of specifications related to the gate valve manholes. (5/4/2012 W. Duncan Dep. p. 24-25, 40-41/Excerpts Ex. G hereto; 2/24/2012 W. Duncan Dep. p. 54-56/Excerpts Ex. K hereto; W. Duncan Aff. ¶ 56/Ex. D hereto). While DPI has offered an additional, alternative evaluation of its damages due to extra depth through expert testimony, Brian Rindt's testimony does not alter DPI's claim related to deeper excavation, which at its core is meant to "cover increased costs which were the direct and necessary result of the change or changed conditions" or defective conditions. Sauer Inc. v. Danzig, 224 F.3d 1340, 1349 (Fed. Cir. 2000); See also John E. Green Plumbing & Heating Co. v. Turner Constr. Co., 742 F.2d 965, 967 (6th Cir. 1984) (contractor's hindrance caused "greater expenditure of manpower than originally planned"). DPI has not changed its claim; DPI's claim for extra excavation remains one for extra work as allowed pursuant to 48 CFR 52.243-4.

The July 23, 2010 Correspondence also discusses the stacking of subcontractors and a "contract shifting of schedule by relocating Duncan Pipeline work crews, equipment, and supplies to accommodate other subcontractors." (W. Duncan Aff. Ex. 6/Ex. D hereto). These costs are not being sought pursuant to the extra excavation claim, but are more accurately captured in DPI's claim

21

for additional compensation related to demobilization and remobilization.   DPI's claim for

demobilization and remobilization refers to costs that it incurred in moving its crews around the 300

plus acre job site in an unanticipated manner.   (W. Duncan Aff. ¶ 45/Ex. D hereto).   Loss of

productivity or inefficiency claims are based on "improper delays" caused by a contracting party.

Luria Bros. & Co. v. United States, 177 Ct. Cl. 676, 695 (Ct. Cl. 1966).   Since the Subcontract claim

only waives contemplated inefficiencies and loss of productivity claims, Plaintiffs' claims related to

costs of moving crews are not waived since such provisions are to be narrowly construed and against

the drafter.   Dep't of Transp. v. Arapaho Constr., 257 Ga. 269, 270 (1987).   However, even if the

mobilization claim is barred, DPI's claim for extra excavation is not barred.

### 2.    Damage Not Contemplated at Execution of Subcontract

Under Georgia and Michigan law, exculpatory clauses limiting damages in construction

contracts are subject to several key exceptions.   Michigan Courts have identified four exceptions to

such clauses: "where the delay (1) was of a kind not contemplated by the parties; (2) amounted to an

abandonment of the contract; (3) was caused by bad faith on the part of the contracting authority; or

(4) was caused by the active interference of the other contracting party." Phoenix Contractors, Inc.

v. General Motors Corp., 135 Mich. App. 787, 792, 355 N.W.2d 673, 676 (1984).   In Georgia,

Courts have refused to enforce clauses like Article V "where the delay is caused by the general

contractor's bad faith or active interference, where the delay is not of a type contemplated by the

parties, or where the delay is equivalent to an abandonment of the contract." Quality Control

Electric, Inc. v. J. A. Jones Constr. Co., 1988 U.S. Dist. LEXIS 5551 (S.D. Ga. June 14, 1988); See

also Dep't of Transp. v. Arapaho Constr., 257 Ga. 269, 270, 357 S.E.2d 593, 594  (1987).

At execution, the Subcontract parties did not contemplate that other underground utilities

would be installed before the water system. (2/24/2012 W. Duncan Dep. p. 54-56/Excerpts Ex. K

hereto). A "failure to properly coordinate work on the project" allows for damages despite a no-exculpatory clause. Green Plumbing & Heating Co. v. Turner Constr. Co., 742 F.2d 965, 967 (6th Cir. 1984). Similarly, DPI expected that the specifications provided by Walbridge, which carried an implied warranty, would produce an acceptable result. Fireman's Fund Ins. Co. v. United States, 92 Fed. Cl. 598 (Fed. Cl. 2010). DPI did not contemplate or foresee having to remobilize or demobilize to the extent that was required at Ft. Stewart. (W. Duncan Aff ¶¶ 46-47/Ex. D hereto).

Therefore, the basis of DPI's claim for equitable adjustment related to the extra excavation and claim for mobilization costs were clearly not contemplated at the time of the Subcontract and therefore, Article V does not bar Plaintiffs' claim. At the very least, a jury question exists as to what was contemplated by the parties at the time the Subcontract was executed. Southern Erectors, Inc. v. New York, 1992 U.S. Dist. LEXIS 8704 (S.D.N.Y. June 16, 1992) ("Whether or not this delay was within the parties' contemplation is a question of fact which must be resolved by the jury.")

### 3.   **Contractual Waiver Barred By Georgia Public Policy**

Even if the "loss of productivity" or "inefficiency" clause bars claims against Walbridge, no portion of Article V bars claims against Travelers and Liberty Mutual. "A right to claim a lien or to claim upon a bond may not be waived in advance of furnishing of labor, services, or materials."[22] O.C.G.A. § 44-14-366 (2012). Here, the Subcontract was executed "in advance" of DPI "furnishing of labor, services, or materials." Article V has no effects on DPI's claims against the sureties.

## F.   **EVIDENCE OF TORT PRECLUDES SUMMARY JUDGMENT**

DPI claims damages due to Walbridge's unauthorized use of certain construction equipment owned by DPI. (Complaint, ¶¶ 63-66).[23] Under Georgia law, "[a]ny unlawful abuse of or damage

---

[22] See Footnote 1, supra.

[23] While the heading above these paragraphs states "conversion," the text of the paragraphs make clear that Duncan seeks damages for Walbridge's tortious use of Duncan's equipment. The

done to the personal property of another constitutes a trespass for which damages may be recovered." O.C.G.A. § 51-10-3 (2012). "Trespass will doubtless lie for acts of interference with goods." Md. Casualty Ins. Co. v. Welchel, 257 Ga. 259, 260 (1987).

Here, the evidence shows that Phil Blankenship, the principal for another Walbridge subcontractor, personally observed Robert Crane, Walbridge's Safety Director, operate DPI's John Deere 544J. (Blankenship Aff. ¶ 4/Ex. N hereto). DPI never gave Walbridge permission to use any of its equipment at Ft. Stewart. (W. Duncan Aff. ¶ 52 4/Ex. D hereto). On another occasion, Andrew Pangborn told Blankenship that DPI's equipment "belonged" to Walbridge. (Blankenship Aff. ¶ 5/Ex. N hereto). Walbridge concedes it operated DPI's equipment and that it considered chaining DPI's equipment up at Ft. Stewart (Walker Dep. p. 139-140/Exceprts Ex. D hereto). Walbridge's site superintendent, Pangborn, concedes he told other subcontractors to use DPI's equipment "rather than haul in another piece of iron in there." (Pangborn Dep. p. 225-227/Excerpts Ex. B hereto). The subject John Deere 544J had more operations hours on it once DPI retrieved it from Ft. Stewart than when DPI last used the tractor at Ft. Stewart. (W. Duncan Aff. ¶¶ 53-54/Ex. D hereto). Therefore, DPI is entitled to compensation for Walbridge's use of DPI's equipment without DPI's consent. Since the evidence at least presents a jury question on DPI's tort claim, Walbridge's argument that DPI's punitive damages claim must fail must be rejected.

## G.   PLAINTIFFS CAN RECOVER FOR VIOLATION OF PROMPT PAY ACT

The Federal Prompt Pay Act ("FPPA") was incorporated into the Subcontract through the inclusion of 48 CFR 52.232-27 in Exhibit F. Liquidating Tr. Ester Duval of KI Liquidation, Inc. v. United States, 89 Fed. Cl. 29, 40 (Fed. Cl. 2009). Therefore, the jury should be allowed to consider

---

count may also be described as a trespass to personalty. Georgia law recognizes that the action of trespass to personalty is "concurrent with" the action of conversion. Md. Casualty Ins. Co. v. Welchel, 257 Ga. 259, 260, 356 S.E.2d 877, 879 (1987).

procedures for withholding payment provided under the FPPA because it is relevant to DPI's breach of contract claim. In <u>U.S. ex rel. Maris Equip. Co. Inc. v. Morganti, Inc.</u>, the Court instructed the jury regarding FPPA's purpose and told the jury to use factors from FPPA when considering the Plaintiff's claims. 163 F. Supp. 2d 174, 197 (E.D.N.Y. 2001). Here, there is clear evidence that Walbridge violated 48 CFR 52.232-27. (Walker Dep. p. 196-207/Excertps Ex. E hereto). Therefore, a jury question is created regarding Walbridge's violation of the FPPA.

### III.   CONCLUSION

DPI has not waived its rights to additional compensation related to the additional bell restraints, extra depth requirements, or the costs of demobilization and remobilization. Specifically, by executing the Partial Unconditional Waivers, Duncan did not waive its rights for additional compensation against Walbridge. Moreover, no provision of the Subcontract released Defendants of their obligation to pay for the additional compensation Duncan seeks in this suit. Therefore, Defendants' Motion for Partial Summary Judgment should be denied.

Respectfully submitted this 29th day of July, 2012.

HALL, BOOTH, SMITH & SLOVER, P.C.

/s/ *Joel L. McKie*
James H. Fisher, II
Georgia Bar No. 261850
Denise W. Spitalnick
Georgia Bar No. 746210
Joel L. McKie
Georgia Bar No. 585780
*Attorneys for Plaintiff*

191 Peachtree Street, NE
Suite 2900
Atlanta, GA 30303-1740
(404) 954-5000
(404) 954-5020 (facsimile)

SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA,    )
for the use and benefit of    DUNCAN    )
PIPELINE, INC., a Georgia corporation, and    )
DUNCAN PIPELINE, INC.,    )
    )    CIVIL ACTION
    Plaintiffs,    )    FILE NO. 4:11-CV-00092-WTM-GRS
    )
    vs.    )
    )
WALBRIDGE ALDINGER    )
COMPANY, a Michigan corporation;    )
TRAVELERS CASUALTY AND SURETY    )
COMPANY OF AMERICA; a Connecticut    )
corporation; and LIBERTY MUTUAL    )
INSURANCE COMPANY, a Massachusetts    )
corporation,    )
    )
    Defendants.    )

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of **Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment** has hereby been filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

Eric L. Nelson, Esq.
Smith, Currie & Hancock, LLP
2700 Marquis One Tower
245 Peachtree Center Ave.
Atlanta, GA 30303-1227

This 29th day of June, 2012.

HALL BOOTH SMITH & SLOVER, P.C.

*/s/ Joel L. McKie*
Joel L. McKie, Esq.
*Attorney for Plaintiff*