IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA for the use and benefit of DUNCAN PIPELINE, INC., a Georgia corporation, and DUNCAN PIPELINE, INC., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CASE NO. CV411-092 |
| WALBRIDGE ALDINGER COMPANY, a Michigan corporation; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation; and LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts corporation, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

O R D E R

Before the Court are Defendants' Partial Motion for Summary Judgment (Doc. 43) and an accompanying Daubert evidentiary motion (Doc. 46). Also before the Court is Plaintiffs' Motion to Strike Answer to Complaint and Affirmative Defense. (Doc. 54.) For the reasons that follow, Defendants' Motion for Partial Summary Judgment (Doc. 43) is **GRANTED IN PART** and **DENIED IN PART**. There exist genuine issues of material fact as to the interpretation of "claims arising from the improvement" in the partial unconditional waivers, a possible equitable

adjustment as a damages measure, and the subcontract's exculpatory clause as it relates to the forseeability of project conditions. However, Defendants motion as to Plaintiffs' claims for conversion, punitive damages, and Prompt Pay Act is **GRANTED** and these claims are **DISMISSED**.

Defendants' request to exclude portions of Plaintiffs' expert (Doc. 46) is **GRANTED IN PART** and **DENIED IN PART**. The Court finds Mr. Rindt qualified. He may testify to the industry standards and practice pertaining to bell restraints and stored materials, but may not offer opinion as to his interpretation of the subcontract. In addition, Mr. Rindt may not testify as to any of the other remaining opinions challenged by Defendants.

Finally, Plaintiffs' Motion to Strike (Doc. 54) is **DENIED**. Duncan Pipeline knowingly and voluntarily signed a subcontract that contained a provision waiving any right to a jury trial. Such a waiver was conspicuous, fairly entered into by sophisticated parties with the ability to reject the subcontract.

## BACKGROUND

The following undisputed facts form the basis of this action.[1] In 2009, Defendant Walbridge Aldinger Company

---

[1] Where relevant, the Court construes the facts in the light most favorable Plaintiffs as the nonmoving party. <u>See</u>

("Walbridge"), entered into a contract with the United States Army Corps of Engineers ("Corps") and agreed to serve as the general contractor for a construction project ("Project") at Fort Stewart, Georgia. (Doc. 45 ¶ 1.) Pursuant to the requirements of the Miller Act, 40 U.S.C. § 3131(b), Walbridge, as principal, and Defendants Travelers Casualty and Surety Company of America ("Travelers") and Liberty Mutual Insurance Company ("Liberty Mutual") issued a payment bond to the Corps. (Id. ¶ 2.) On July 22, 2009, Walbridge entered into a subcontract with Duncan Pipeline, Inc. ("Duncan Pipeline") to supply labor and material for the Project's water distribution system. (Id. ¶ 3.) Duncan Pipeline's work included excavating trenches, installing water pipes, manholes, valves, fire hydrants as well as backfilling trenches. (Id. ¶ 4.)

The subcontract provides that "[Duncan Pipeline] shall not be entitled to receive any amount for overhead or profit or for any inefficiencies of loss of productivity and shall not assert any claim for overhead or profit or damages due to loss of productivity or inefficiency." (Doc. 1, Ex. A, Art. V.) Further, the subcontract allows Walbridge, as the contractor, to "order extra [or] additional work, deletions,

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 577-78 (1986).

or other modifications to the Work, such changes to be effective only upon written order of [Walbridge]." (Id., Art. VII ¶ 1.) Duncan Pipeline, if directed to do so, shall "proceed in accordance with the order, and the subcontract price shall be adjusted as reasonably determined by [Walbridge] with any dispute to be resolved after the completion of the work." (Id.) The subcontract continues that Duncan Pipeline "shall not receive payment for additional work or work that deviates from the Drawings and Specifications performed without a written authorization from [Walbridge]." (Id.)

In order for Duncan Pipeline to be compensated for changed work, it must, "within fourteen days of receipt of direction to perform changed work, and in any event within the time permitted by the Agreement between [the Corps] and [Walbridge] for submission of quotations to [the Corps]" a written quotation for the changed work. (Doc. 1, Ex. A, Art. VII ¶ 2.) The subcontract further provides:

> In the event that [Duncan Pipeline] fails to submit a quotation within the time limits set forth in the Article VII, [Walbridge] shall prepare a quotation with respect to the changed work proposing an estimated amount for the increase or decrease in the subcontract price for the changed work, and [Duncan Pipeline] shall be bound by such estimate and shall be deemed to have waived any right to propose a different amount.

(Id. ¶ 3.)  Critically, "[Duncan Pipeline] shall promptly give written notice of any claim for adjustment of the subcontract price under this Article within the time limits provided in this Subcontract and within such time to permit [Walbridge] to comply with the requirements of the Agreement between [the Corps] and [Walbridge]." (Id., Art. II ¶¶ 2-3.)

Finally, the subcontract "waive[s] trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Agreement, the relationship of [Walbridge] and [Duncan Pipeline], and/or any claim or injury or damage." (Doc. 1, Ex. A, Art. XIX ¶ 3.) The choice-of-law provision states "the subcontract shall be governed by the laws of the State of Michigan." (Id., Art. XXVIII(k).)

Under these relevant subcontract terms, Duncan Pipeline began its subcontractor work in August 2009. Shortly after work began, Duncan Pipeline contends Walbridge ordered work done that Duncan Pipeline considered outside the subcontract's scope—namely, installing bell restraints,[2]

---

[2] At its least technical level, bell restraints are installed where pipes are joined together in order to prevent the pipes from separating when under pressure. The bell restraints were necessary because the in-line gate

performing additional excavation work, and remobilizing crews because of interferences it encountered during excavation. (Id. ¶ 7.) Duncan Pipeline began installing the additional bell restraints in August or September 2009. (Id. ¶ 8.) Duncan Pipeline submitted a written bond claim in May 2010 for the additional bell restraints, which Walbridge denied. The additional excavation work and remobilization of crews also began in August or September 2009. Duncan Pipeline submitted a written "Loss of Production and Excessive Excavation Depth" bond claim to Walbridge in June 2010 for these claims, which was also denied. It is undisputed the work was completed in June 2010. (Id. ¶ 12.)

It is also undisputed that Duncan Pipeline signed and submitted to Walbridge nine partial unconditional waivers between August 20, 2009 and April 20, 2010. (Id. ¶ 16.) Each of these waivers provided that Duncan Pipeline "waive[s] [its] construction lien rights, rights against any payment bonds, and claims arising from the improvement" and "together with all previous waivers, if any, does cover all amounts due to [it] for the contract improvements provided through the date as above." (Doc. 44, Ex. H at 2-10.)

---

valves were not treated as dead-ends for purposes of thrust restraint and, presumably, needed to be joined together with the additional pipe.

Duncan Pipeline submitted a claim for $1,214,838.90 against Walbridge and its sureties to recover for the additional work it performed beyond the scope of the subcontract. Walbridge and the sureties refused payment. As a result of the refusal, Duncan Pipeline brought this suit in April 2011. In its complaint, Duncan Pipeline alleges eleven counts against Defendants: (1) breach of contract of the original subcontract price (Doc. 1 ¶¶ 14-19); (2) breach of contract of the subcontract price as amended (id. ¶¶ 20-26); (3) breach of contract when Walbridge orally ordered Duncan Pipeline to perform work beyond the original scope of the subcontract (id. ¶¶ 27-33); (4) quantum meruit (id. ¶¶ 34-38); (5) unjust enrichment (id. ¶¶ 39-42); (6) Miller Act claim on unpaid payment bonds (id. ¶¶ 43-51); (7) attorney's fees under O.C.G.A. § 13-6-11 (id. ¶¶ 52-54); (8) attorney's fees under O.C.G.A. § 13-11-8 (id. ¶¶ 55-57); (9) violation of the Federal Prompt Pay Act, 31 U.S.C. § 3905(b) (id. ¶¶ 58-61); (10) conversion for Walbridge's unauthorized use of Duncan Pipeline's construction equipment (id. ¶¶ 62-66); and (11) punitive damages (id. ¶¶ 67-69).

Defendants have filed a partial motion for summary judgment, seeking dismissal of Plaintiffs' claims for additional compensation, conversion, punitive damages, and

violations of the Prompt Pay Act. (Doc. 44 at 4-5.) According to Defendants, Duncan Pipeline waived any potential claims through April 20, 2010 by signing the partial unconditional waivers, failed to provide timely notice of its claims for additional work and loss of production, and expressly waived its excessive excavation and loss of production claims by the terms of the subcontract. (Id.) Moreover, Defendants assert that Plaintiffs' conversion and punitive damages claims lack the necessary elements under Georgia law and that the Prompt Pay Act does not provide a private right of action. (Id. at 16-19.) In response, Plaintiffs contend that the waivers are unenforceable under Georgia law, were entered into for the direct benefit of the Corps and not Defendants, and are unclear and ambiguous. (Doc. 55 at 3-11.) Plaintiffs also argue that it complied with the subcontract's notice obligations (id. at 12-16) and that Walbridge waived any written notice requirement by its conduct (id. at 19-20). Finally, Plaintiffs suggest that Duncan Pipeline's claims for extra excavation and equitable adjustment should not be barred because they were based on circumstances not contemplated at the time of the subcontract's execution. (Id. at 20-23.)

Defendants have also moved to exclude testimony from Plaintiff's expert, Mr. Brian Rindt. (Doc. 46.) Defendants argue that Mr. Rindt's opinion should be excluded because it is "merely his interpretation of contract terms or conclusory statements without any analysis" and that he is not qualified to offer an opinion because he has "no experience with [Corps] projects." (Doc. 47 at 1.) In response, Duncan Pipeline states that Mr. Rindt is qualified and his expert opinions should not be excluded. (Doc. 49 at 1-2.)

Finally, Duncan Pipeline seeks to strike Defendants' affirmative defense that Duncan Pipeline waived its right to a jury trial because of a pre-litigation jury waiver provision of the subcontract. (Doc. 54 at 3.) Plaintiffs contend that Georgia law applies, and therefore, under Georgia law, the pre-litigation jury waiver is not enforceable and they are entitled to have the case tried by a jury. (Id.) In response, Defendants argue the motion is untimely and was knowingly and voluntarily waived by the plain language of the subcontract. (Doc. 58 at 1.)

**ANALYSIS**

I.   DAUBERT MOTION TO EXCLUDE

The admission of expert testimony is controlled by Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"As the Supreme Court made abundantly clear in Daubert, Rule 702 compels district courts to perform the critical gatekeeping function concerning the admissibility of expert scientific evidence." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal quotation omitted). The Eleventh Circuit Court of Appeals has explained that district courts fulfill that function by engaging in a three part inquiry, considering whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as to be determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific . . . expertise, to understand the evidence or to determine a fact in issue.

Id. While there will often be some overlap between these concepts of qualification, reliability, and helpfulness, they are distinct concepts that courts should be careful not to conflate. Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK,

Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003).  The burden of establishing that these requirements are met rests with the proponent of the expert testimony, and not the Daubert challenger.  McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002).

When a court considers the reliability of a particular expert's opinion, it considers, to the extent possible, (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Quiet Tech., 326 F.3d at 1341 (citing McCorvey, 298 F.3d at 1256).  These factors "do not constitute a 'definitive checklist or test.' "  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593 (1993)).  Rather, the applicability of these factors "depends upon the particular circumstances of the particular case at issue."  Id.  Because Plaintiffs motion to strike is denied and the subcontract's jury waiver is valid, see infra Section III, the barriers under Rule 702 are "more relaxed in a bench trial situation, where the judge is serving as factfinder."  United States v. Brown, 415 F.3d 1257, 1268-69 (11th Cir. 2005).  Simply, "[t]here

is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."  Id. However, Plaintiffs must still demonstrate that the expert testimony meets the necessary requirements.

Plaintiffs have retained Mr. Rindt to testify that Duncan Pipeline was ordered to perform work outside of the terms called for in the subcontract.  (Doc. 49 at 2.)  Mr. Rindt holds a Bachelor of Civil Engineering and Master of Science Degree in engineering and co-founded a civil and environmental engineering firm.  (Id.)  He is the past president of two water professional groups and a registered engineer in seven states with thirty five years of experience.  (Id. at 2-3.)

Defendants move to exclude Mr. Rindt first on the basis of his qualification and second on the grounds that his opinions fail to satisfy Daubert and Rule 702.  (Doc. 47 at 6.)  According to Defendants, Mr. Rindt is not qualified to provide any opinions regarding the Project because he "lacks the requisite experience, knowledge, skill and education to provide an expert opinion on utility work for a Corps' project."  (Id.)

Defendants contend that Mr. Rindt has no experience with Corps projects and has never served as a utility installer or excavator.  (Doc. 47 at 6-7.)  However, Mr.

12

Rindt's lengthy resume indicates he has rather extensive experience estimating water treatment and distribution projects, serving as project manager and senior design engineer. (Doc. 39, Ex. B at 19.)  And while Mr. Rindt may have limited experience with Corps projects, Rule 702 takes a liberal view of expert witness qualifications—an expert's training and experience need not be narrowly tailored to match the exact point of dispute in a case.  See Wilson v. Blue Bird Corp., 2010 U.S. Dist. LEXIS 144144 (N.D. Ga. Oct. 27, 2010).  Mr. Rindt has over three decades of experience with water line design and construction as well as leadership positions in water professional groups.  (Doc. 38, Ex. A at 5.)  Thus, in the Court's opinion, Mr. Rindt is qualified to provide opinions regarding Plaintiffs' claims.

Defendants next allege that several of Mr. Rindt's expert opinions should be excluded because they fail to satisfy the requirements of Rule 702 and Daubert.  (Doc. 47 at 7-18.)  The Court will now address each of Mr. Rindt's challenged opinions.

A.    Bell Restraints

Mr. Rindt has testified that in his professional opinion and experiences, he has never designed or seen designed bell restraints on valves located on straight sections of buried pipe, as is the case here.  (Doc. 38, Ex.

A at 6.)   He is also prepared to testify regarding the standards of industry practice and the requirements of bell restraints.   (Id. at 6-8.)   Mr. Rindt has relied on a series of deposition testimony, review of project documents, and industry standards and guides to conclude that the subcontract did not require Duncan Pipeline to install the additional bell restraints.

Where there are ambiguities in its terms, the interpretation of a contract is for the trier of fact to decide.   The Eleventh Circuit and courts within the Eleventh Circuit have excluded expert testimony where it is simply a reiteration or recasting of a parties' interpretation of a contract.   See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1111 (11th Cir. 2005) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."); Mich. Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 140 F.3d 915, 921 (11th Cir. 1998); Coyote Portable Storage, LLC v. PODS Enters., Inc., 2011 1870593, at *3-4 (N.D. Ga. May 16, 2011) ("The question of interpretation of the contract is for the [trier of fact], and the question of legal effect is for the judge.   In neither case do we permit expert testimony."); Ramjeawan v. Bank of Am., 2010 WL

1645097, at *1 (S.D. Fla. April 21, 2010); Am. Mut. Ins. Co. v. Morowitz, 2009 WL 2179703, at *2 (S.D. Fla. Oct. 1, 2009); Plantation Pipeline v. Cont'l Cas. Co., 2008 WL 4737163, at *7 (N.D. Ga. July 31, 2008).

To the extent that Mr. Rindt's testimony is used to develop an understanding of industry standards and practice, his expert opinion is not excluded.  However, Plaintiffs have not alleged any trade or industry terms in the subcontract that would require an expert opinion on a term's meaning or interpretation.  Therefore, to the extent that Mr. Rindt's provides an expert opinion on the interpretation of the contract, such testimony is excluded because it offers "nothing more than what lawyers for the parties can argue in closing arguments." Cook, 402 F.3d at 1111 (citing United States v. Frazier, 387 F.3d 1244, 1262-63 (11th Cir. 2004)).

B.     Fire Hydrant Riser Adjustment

Mr. Rindt is expected to testify that Duncan Pipeline could not properly place fire hydrants at a particular grade because it was never provided with the necessary information.  (Doc. 49 at 13.)  Mr. Rindt also states that "it is customary to install water lines after the final grades have been established." (Doc. 47, Ex. E at 8-9.)  Mr. Rindt's analysis and factual basis raises concerns as to

Daubert and Rule 702.   Mr. Rindt's testimony simply provides that the adjustments occurred because it is "likely that the final grade in various locations on site were not established."   (Id.)   There is no explanation or specifics as to the factual or analytical basis for his opinions.   See Cook, 402 F.3d at 1111 (11th Cir. 2005) ("Trial courts may exclude expert testimony that is imprecise and unspecific, or whose factual basis is not adequately explained.").   In fact, it is unlikely that the trier of fact would even need assistance by an expert witness in understanding this evidence.   Accordingly, Mr. Rindt's statements as to the fire hydrant riser adjustments must be excluded.

> C.   Increased Cost for Stored Materials

At his deposition, Mr. Rindt testified that Duncan Pipeline "should have been allowed to store materials and be paid for the stored materials, as is customary in the industry, and since [it] was not allowed to do that, [it] had to experience the price increases in materials with time that he would not have otherwise have incurred."   (Doc. 49 at 14.)   In his 26(a)(2)(B) report, Mr. Rindt states that "[s]ince the customary allowance for 'materials stored' was not permissible on this project," Duncan Pipeline had to pay increased prices for materials.   (Doc. 38, Ex. A at 9-10.) To the extent that Mr. Rindt's testimony is used to explain

industry standards, custom, and practice pertaining to the storage of materials by a subcontractor on a project's site, the opinion is not excluded.   However, Mr. Rindt may not testify as to whether Duncan Pipeline was permitted under the subcontract to store materials on site or was entitled to additional compensation—such opinions are of contractual interpretation and improper for expert testimony.   See Cook 402 F.3d at 1111.

D.   Spoil Piles

Mr. Rindt is also expected to testify that Duncan Pipeline was forced to absorb the cost of moving spoil piles left by other subcontractors.   (Doc. 38, Ex. A at 10.)   Mr. Rindt concludes that Duncan Pipeline "moved the spoil pile at [its] expense and should be reimbursed for this cost." (Id.)   Mr. Rindt's statements are simply a reiteration of Plaintiffs claims as to the subcontract's terms.   Nothing in this testimony would assist the trier of fact in making a determination as to the spoil piles.   Thus, Mr. Rindt's opinion regarding the spoil piles is excluded.

E.   Change Order 005, Repair Gas Main

Next, Mr. Rindt's expert report provides that "[t]he gas main was damaged by [Duncan Pipeline] due to the fact that the gas line locate was off by 10 ft.   It was not Duncan's fault."   (Doc. 38, Ex. A at 10.)   This opinion

fails to make anything but a conclusory statement devoid of factual or analytical support. See Cook, 402 F.3d at 1111 (11th Cir. 2005)  Accordingly, Mr. Rindt's opinion as to Change Order 005 is excluded.

F.   Change Order 006

Much like Change Order 005, Mr. Rindt also alleges that "Change Order 006 included a variety of additions to [Duncan Pipeline's] scope of work as well as some unforeseen conditions.  All the items listed are legitimate." (Doc. 38, Ex. A at 10.)  Again, this opinion is a conclusory statement that is not adequately explained and devoid of any factual or analytical support. See Cook, 402 F.3d at 1111. Accordingly, Mr. Rindt's opinion as to Change Order 006 is excluded.

G.   Tie-In Altitude Valve & Negotiate Utilities

In his expert opinion, Mr. Rindt will testify at trial that Duncan Pipeline was not compensated for work performed to connect a particular altitude valve to a water tank. (Doc. 38, Ex. A at 10.)  His testimony will also add that Duncan Pipeline was asked to do work that was "clearly an extra to [its subcontract]."  (Id. at 11.)  The issue arising from Duncan Pipeline's obligations under the subcontract and any purported work ordered outside of the subcontract's terms is not aided by Mr. Rindt's opinion

because, in a conclusory fashion, it simply recasts Plaintiffs' argument. Indeed, the trier of fact can easily resolve these factual issues without an expert opinion. Thus, Mr. Rindt's opinion as to the tie-in altitude valve is excluded.

### H.   Repairs to the 2" Water Line at Storm Crossing

Mr. Rindt's report explains that, in his opinion, the denial of Duncan Pipeline's claim by the surety was in error because the repairs that were made "had nothing to do with the sequencing of the work" and were requested to be performed. (Doc. 38, Ex. A at 11.) Again, Mr. Rindt's expert opinion is flawed because it is unsupported and merely a conclusory statement missing factual or analytical support. See Cook, 402 F.3d at 1111. Accordingly, Mr. Rindt's opinion as to the Repairs of the 2" Water Line at the Storm Crossing are excluded.

### I.   Excessive Excavation Claims

Plaintiffs intend to have Mr. Rindt also testify as to Duncan Pipeline's reasonable expectation when it bid the subcontract for 36" of dirt cover and that Duncan Pipeline's additional work was because of misleading drawings regarding the dirt cover. (Doc. 38, Ex. A at 11-12.) Mr. Rindt plans to testify that "the scope of [Duncan Pipeline's] duties did not include laying water lines at a greater depth than

required" because communication and electrical conduits were installed first, and out of sequence. (Id. at 12.) As with Mr. Rindt's opinions regarding the additional bell restraints, his opinions as to the excessive excavation is simply another conclusory restatement of Plaintiffs' interpretation of the subcontract. The opinion is not sufficiently substantiated to satisfy the reliability requirements and contains nothing more than what Plaintiffs' lawyers could essentially argue in closing arguments. See Cook, 402 F.3d at 1111. Thus, Mr. Rindt's opinion to excessive excavation must be excluded.

J.  Pay Request #12

Mr. Rindt is also expected to testify that Travelers—as surety—denied Pay Request #12 despite there being no evidence of poor performance by Duncan Pipeline and that Travelers had "no regard for the facts." (Doc. 38, Ex. A at 13.) Yet again, Mr. Rindt has provided nothing more than a conclusory statement on a matter that does not necessitate an expert opinion. Such unsupported and inadequately explained grounds warrant exclusion of Mr. Rindt's opinion as to the Pay Request #12.

K.  Balance Left on Contract

Mr. Rindt's testimony also includes opinions as to possible back charges assessed against Duncan Pipeline.

(Doc. 38, Ex. A at 13.)   In Mr. Rindt's expert opinion "work that was not required of [Duncan Pipeline] should not be back charged against [it]."   (Id.)   These opinions are another example of testimony that neither requires an expert opinion nor provides anything more than a conclusory statement.   See Cook, 402 F.3d at 1111.   Accordingly, Mr. Rindt's opinion as to the balance left on the subcontract is excluded.

L.   Restocking Fees

Mr. Rindt's report indicates that "the attempted termination of [Duncan Pipeline's] subcontract was flawed based on the fact that [Duncan Pipeline] never received the required written notice set forth [in the subcontract]." (Doc. 38, Ex. A ¶ 14.)   This opinion is nothing more than another conclusory statement that involves a matter not even at issue in the case.   Additionally, there is no need for an expert opinion on restocking fees because it would not assist the trier of fact in understanding a non-issue.

M.   Excessive Remobilization/Demobilization

As to the claims for excessive remobilization and demobilization of Duncan Pipeline's crews, Mr. Rindt's expert opinion states that Duncan Pipeline was forced to perform these "due to the poor coordination of the project as a whole, and more specifically, poor coordination of the

subcontractor's activities resulting in [Duncan Pipeline] not being able to carry out its contractual obligations in a steady, organized and continuous stream of activity." (Doc. 38, Ex. A at 14.)   Mr. Rindt testified that by "[j]ust looking at it, assuming the numbers are right, the mobilization, demobilization numbers are accurate, they looked reasonable." (Doc. 47 at 16.)   Mr. Rindt's testimony simply asserts that the claims for excessive mobilization made by Duncan Pipeline were reasonable.    Such a determination should not only be left to the trier of fact, but is also a determination that can be made without the need for an expert opinion.   Moreover, Mr. Rindt's opinion is imprecise[3] and does not provide an adequate factual basis to support the opinion.   See Cook, 402 F.3d at 1111.   As a result, Mr. Rindt's opinion as to these claims is excluded.

N.   Additional Bond Costs

Finally, Mr. Rindt's expert report states that "[i]ncreases in bond costs due to increases in the [sub]contract amount for unanticipated conditions and increases in the scope of the work should be reimbursable."

---

[3] That is not to say that approximations or estimates by an expert witness are improper.   Rather, in this case, Mr. Rindt relied solely on information provided to him by Duncan Pipeline.   Without more, the reliability of Mr. Rindt's testimony does not meet the Daubert or Rule 702 requirements.

(Doc. 38, Ex. A at 14.)   Mr. Rindt's opinion is not developed by any factual or analytical support and there is no need for an expert opinion to help understand this factual issue.   As a result, Mr. Rindt's opinion as to additional bond costs is excluded.

II.   <u>MOTION FOR SUMMARY JUDGMENT</u>

    A.   <u>Summary Judgment Standard</u>

    According to Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part or each claim of defense—on which summary judgment is sought."   Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   <u>Id.</u>   The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' "   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (<u>quoting</u> Federal Rules of Civil Procedure 56 advisory committee notes).

    Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).   The

substantive law governing the action determines whether an element is essential.   DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portion of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323.   The burden then shifts to the nonmovent to establish, by going beyond the pleadings, that there is a genuine issue as to facts that are material to the nonmovant's case.   Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant.   Matsushita, 475 U.S. at 587-88. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."   Id. at 586.   A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice.   See e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998).   Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that

inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

    B.   Choice of Law

This action involves the interpretation of a subcontract's provisions. Thus, the Court must determine which state law is to govern this interpretation. The subcontract between Walbridge and Duncan Pipeline contains a choice of law clause providing that "this Subcontract shall be governed by the laws of the State of Michigan." (Doc. 1, Ex. A, Art. XXVIII(k).) The jurisdiction in this case is based on both federal question—for the Miller Act and Prompt Pay Act claims—and diversity jurisdiction—for the remaining state law claims.

Where jurisdiction is based on both federal question and diversity jurisdiction, the court must look to the choice of law rules of the state in which the action was filed to determine the applicable law. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 488 (1941). This case was filed in Georgia, and the Court must examine Georgia's choice of law requirements to determine what law applies. In Georgia, "[a]bsent a contrary public policy, this court will normally enforce a contractual choice of law clause." Carr v. Kupfer, 250 Ga. 106, 107, 296 S.E.2d 560, 562

(1982).   Therefore, because the subcontract provides that the laws of Michigan govern the dispute and the Court cannot discern an overriding public policy interest, Michigan law applies.

C.   Plaintiffs' Claims

    1.   Additional Compensation Claims

In their motion, Defendants argue that Plaintiffs' claims for additional compensation for the bell restraints, excessive excavation, and remobilization are barred by the execution of the nine unconditional waivers, the lack of timely notice of the submission of such claims, and the terms of the subcontract.   (Doc. 44.)

    a.   Waivers

The United States Supreme Court has held that "[t]he Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law." F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 127 (1974).   However, in a Miller Act case involving issues that do not require construction of the statute, such as ordinary contract issues, state law should apply.   See United States ex rel. U.S. Steel Corp. v. Constr. Aggregates Corp., 559 F. Supp. 414, 424 (E.D. Mich. 1983), rev'd in part on other grounds, 738 F.2d 440 (6th Cir. 1984).

Under the Miller Act, a "waiver of the right to bring a civil action on a payment bond" must be "(1) in writing; (2) signed by the person whose right is waived; and (3) executed after the person whose right is waived has furnished labor or material for use in the performance of the contract."  40 U.S.C. § 3133(c).  When determining whether a subcontractor has waived its Miller Act rights, the Eleventh Circuit has opined that

> "[t]he right to sue on a surety bond is a right created by statute, and in the absence of a novation or clear expression to the contrary, the contention that there has been a waiver or release of that right must fail" . . . [and] absent a novation, waiver, estoppel, or other clear and explicit relinquishment of the statutory right, a supplier is entitled to pursue payment under a bond.

Trane Co. v. Whitehurst-Lassen Const. Co., 881 F.2d 996, 1003 (11th Cir. 1989) (quoting United States v. Forrester, 441 F.2d 779, 782 (5th Cir. 1971)) (citations omitted).[4] Further, if a release is unclear, federal courts may look to state law for guidance resolving the clarity of a release. See Youngstown Welding & Eng'g Co. v. Travelers Indem. Co., 802 F.2d 1164, 1167 (9th Cir. 1986).

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

Here, Duncan Pipeline signed nine partial unconditional waivers from August 20, 2009 to April 20, 2010. (See Doc. 44, Ex. H at 2-10.) Each of these waivers were signed by a Duncan Pipeline officer and executed after labor and materials had been furnished. The terms "waive [Duncan Pipeline's] construction lien rights, rights against any payment bonds, and claims arising from the improvement." (Id.) The waivers "cover all amounts due to [Duncan Pipeline] for the contract improvements provided through the date as above." (Id.) Lastly, the waivers acknowledge that the information may submitted to the Corps "for purposes of [the Corps'] compliance with applicable Construction Lien Laws." (Doc. 44, Ex. H at 2-10.)

Defendants cite several cases from the Eastern District of Michigan to suggest that Duncan Pipeline's wavier was clear and explicit. (Doc. 44 at 7.) Plaintiffs, on the other hand, analogize this case to a decision by the Michigan Court of Appeals that contained a nearly identical partial unconditional waiver. (Doc. 63 at 3.) The cases cited by Defendants in support of their proposition that the wavier is clear and explicit, Johnson Controls, Inc. v. Hunt Const. Grp., 2004 WL 3323608 (E.D. Mich. Aug. 13, 2003) (unpublished) and Hunt Const. Grp. v. Const. Servs., Inc., 375 F. Supp. 2d 612 (E.D. Mich. 2005) contain significantly

broader waiver language than those at issue in this case. In Johnson Controls, for example, the waiver contains a provision whereby the subcontractor

> waive[s] and release[s] to the owner and [Contractor] any and all claims and liens . . . [and that it] waives, releases, and relinquishes any and all claims, rights or causes of action whatsoever arising out of or in the course of work performed on the [project], contract, or event transpiring prior to the date hereof.

Johnson Controls, 2004 WL 3323608, at *4.  Similarly, in Hunt Construction, the subcontractor agreed to terms stating that it would "waive[], release[] and relinquish[] any and all claims, rights, or causes of action whatsoever arising out of or in the course of the work performed on the [project], contract or event transpiring prior to the date hereof.  Hunt Construction, 375 F. Supp. 2d at 617-18.

The language of the waivers at issue here are not as broad as those in Johnson Controls or Hunt.  In fact, while the terms "construction lien rights" and "rights against any payment bonds" are arguably clear and explicit,[5] "claims arising from the improvement" is not.  Regardless of the applicability of state lien law to the waivers, the waivers' language is ambiguous—specifically, it is not clear and

---

[5] The waivers appear to be based on MCL 570.1115(9), which provides a format to executive construction lien waivers. The parties added the phrase "claims arising from the improvement" to the waivers.

explicit from a plain reading of the waivers what
encompasses "claims arising from the improvement" or
"contract improvements." As a result, there remains a
factual issue as to whether the releases did, in fact,
release claims related to the bell restraints, additional
excavation, loss of production, and remobilization.
Accordingly, Defendants' motion for summary judgment with
respect to the waivers must be denied.

    b.   Notice

    Next, Defendants move for summary judgment based on
Duncan Pipeline's failure to provide proper or timely
notice, as required under the subcontract. (Doc. 44 at 10-
13.) According to Defendants, Duncan Pipeline "did not
provide written notice of its claims related to the bell
restraints, loss of production and excessive excavation, and
mobilization until at least eight months after purportedly
being told to perform the work." (Id. at 10.) In response,
Plaintiffs claim that Duncan Pipeline complied with the
contractual notice obligations, Article VII notice is not
relevant, actual notice existed under 48 CFR 52.243-4, no
time limit was required for written notification because the
specifications were defective, the time limits were extended
by Walbridge, and that Walbridge's conduct waived any
written notice requirements. (Doc. 55 at 12-20.)

                i.    Notice Requirements under Article
VII of Subcontract

Defendants move for summary judgment on the grounds
that Duncan Pipeline waived its claims by failing to provide
proper written notice of any changes within the time period
prescribed by Article VII.   (Doc. 44 at 10.)   Plaintiffs
contend that Article VII of the subcontract only provides
time limits for Duncan Pipeline to submit quotations
proposing the increase in the subcontract price.   (Doc. 55
at 13.)

Generally, Article VII allows Walbridge to order extra
or additional work beyond the scope of the subcontract.
(Doc. 1, Ex. A, Art. VII ¶ 1.)   If there is a disagreement
as to the requested adjustment, Article VII states that
Duncan Pipeline should proceed in accordance with the order
and the subcontract price "shall be adjusted as reasonably
determined by [Walbridge] with any dispute to be resolved
after completion of the work."   (Id.)   Duncan Pipeline would
receive no payment for additional work or work that deviated
from the plans without written authorization from Walbridge.
(Id.)   Within fourteen days of the receipt of a direction to
perform changed work, Duncan Pipeline was required to submit
to Walbridge a written itemized quote.   (Id. ¶ 2.)   If
Duncan Pipeline failed to do so, Walbridge would be required

to prepare a quote as to the changed work, and Duncan Pipeline then waives any right to propose a different amount. (Id. ¶ 3.)

Where a contract is ambiguous, Michigan courts may construe the agreement in an effort to find and enforce the parties' intent. Zurich Ins. Co. v. CCR & Co., 226 Mich. App. 599, 607, 576 N.W.2d 392, 397 (1997). Under Michigan law, where a contract's terms can be interpreted in different ways, a construction that is fair and reasonable is preferable to one that is "less just and less reasonable." Schroeder v. Terra Energy, Ltd., 223 Mich. App. 176, 188, 565 N.W.2d 887, 894 (1997); see also Old Kent Bank v. Sobczak, 243 Mich. App. 57, 63, 620 N.W.2d 663, 667 (2000). Additionally, under Michigan law, claims are waived where a contract provides a time requirement to file a written claim and a party fails to timely do so. See Reynolds v. Allstate Ins. Co., 123 Mich. App. 488, 490-91, 332 N.W.2d 583, 584 (1983); see also PCL Civil Constructors, Inc. v. Dep't of Transp., 2003 WL 22715798, at *2 (Mich. Ct. App. 2003) (unpublished).

At present, Plaintiffs argue that the subcontract's change provisions and the written notice requirements are not mandatory and do not preclude a claim, but rather merely bar Duncan Pipeline from proposing an amount for the changed

work.   (Doc. 55 at 13.)   After discerning the parties'
intent from a review of the subcontract and the record,
Plaintiffs' interpretation of Article VII is strained.
Taken together, Article II's requirement that Duncan
Pipeline "promptly give written notice of any claim for
adjustment of the subcontract price" evinces the intent
found in Article VII mandating that Duncan Pipeline provide
a written quotation to Walbridge within fourteen days of an
order to perform changed work.   (Doc. 1, Ex. A Arts. II, VII
¶ 1.)   The purpose of requiring Duncan Pipeline to provide
Walbridge with "prompt" notification of any possible
additional payment claims and a written quotation is so that
Walbridge could then satisfy any obligations it may have had
with the Corps.   The written notice for the bell restraint
and other claims did not come in writing until at least May
18, 2010, well over eight months after Duncan Pipeline
purports to have been ordered to perform additional work.
Further, the contract expressly states that Duncan Pipeline
"shall not receive payment for additional work or work that
deviates from the Drawings and Specifications performed
without a written authorization from [Walbridge]."   (Id.
Art. VII ¶ 1.)   Duncan Pipeline never received written
authorization from Walbridge for the additional work.   As a
result, Duncan Pipeline's failure to comply with the notice

requirement warrants summary judgment in favor of Defendants as to the additional compensation claims.

ii.  Actual Notice under FAR 52.243-4

Even assuming that Article VII does not bar Duncan Pipeline from submitting notice of its claims beyond fourteen days, Plaintiffs' alternative theory also fails. The subcontract incorporated Federal Acquisition Regulation ("FAR") Clause 52.243-4.  FAR 52.243-4 provides, in relevant part:

> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; provided, that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order.
>
> (c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.
>
> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the

34

Government is responsible, the equitable
adjustment shall include any increased cost
reasonably incurred by the Contractor in
attempting to comply with the defective
specifications.

(e) The Contractor must assert its right to an
adjustment under this clause within 30 days after
(1) receipt of a written change order under
paragraph (a) of this clause or (2) the furnishing
of a written notice under paragraph (b) of this
clause, by submitting to the Contracting Officer a
written statement describing the general nature
and amount of proposal, unless this period is
extended by the Government. The statement of
proposal for adjustment may be included in the
notice under paragraph (b) above.

48 CFR 52.243-4 (2012).  The United States Court of Federal

Claims has explained that

[a]lthough the changes clause describes a twenty-
day time limit for providing notice to the
contracting agency, the general rule described in
the case law for evaluating compliance with the
clause's notice requirement is more flexible:
Written notice as to constructive changes must be
supplied by the contractor before such time that
the Government would suffer if not apprised of the
facts. Thus, if the contracting officials have
knowledge of the facts or problems that form the
basis of a claim and are able to perform necessary
fact-finding and decisionmaking, the Government is
not prejudiced by the contractor's failure to
submit a precise claim at the time a constructive
change occurs.

K-Con Bldg. Sys., Inc. v. United States, 100 Fed. Cl. 8, 30

(Fed. Cl. 2011) (citations and quotations omitted).

Plaintiffs contend that because FAR 52.243-4 has been

incorporated into the subcontract and that several Walbridge

employees acknowledged that Walbridge was "looking into" or

"researching" the bell restraint issue, Walbridge had knowledge of the facts or problems that form the basis of Duncan Pipeline's claims. (Doc. 55 at 15.) While Plaintiffs briefly mention that a Walbridge daily report to the Corps in August 2009 indicates that the bell restraint issue was being discussed and researched (Doc. 55, Ex. J), nothing in the record demonstrates that the contracting official had knowledge of any of the underlying facts or problems that would form the basis of Plaintiffs claim.

While FAR 52.243-4 was incorporated into the subcontract, Plaintiffs are mistaken to assert that, based upon FAR 52.243-4 and K-Con Bldg. Sys., Walbridge's knowledge of a possible claim by Duncan Pipeline was sufficient for it to perform fact-finding and decision making. Unlike K-Con Bldg. Sys., which addresses the knowledge of the Government's contracting official that would place the Government on notice of a possible claim adjustment, in this case the issue only extends to Walbridge, and not to the Corps. Thus, Plaintiffs' argument that it provided actual notice under FAR 52.243-4 is unpersuasive.

### iii. Defective Subcontract
### Specifications

Plaintiffs next argue that even if time limits of Article VII apply, those time limits should be ignored in light of defective subcontract specifications. (Doc. 55 at 16-18.) According to Plaintiffs, Walbridge's insistence that additional bell restraints for the in-line gate valves supports a claim for equitable adjustment because of defective specifications. (Doc. 55 at 17.) Plaintiffs argue that equitable adjustment is further warranted for the extra excavation that Duncan Pipeline was required to perform when burying pipe deeper than the specifications provided. (Id.) To those ends, Plaintiffs maintain that because of the equitable adjustment, pursuant to 48 CFR 52.243-4(d), there was no requirement that Duncan Pipeline submit written notice to Walbridge because the bell restraint claims were based on defective specifications, and the specifications were misleading and deceptive. (Id.)

Exhibit D of the subcontract, which outlines the scope of Duncan Pipeline's work, states that Duncan Pipeline should "provide a complete, operational water system including but limited to . . . [providing] water main accessories, gate valves and check valves as specified and where indicated." (Doc. 1, Ex. A at 27.) In July 2010,

Duncan Pipeline made two requests for equitable adjustment because of the additional bell restraints, loss of production, and excessive excavation depths from the defective subcontract specifications. (Doc. 44, Ex. F at 26-28, 33-36.)   The first request outlines that Project Drawing CU502-Detail 4 as well as other specifications and drawings do not specifically identify how the in-line valves should be treated.  (Id. at 26.)  The second request alleges that Duncan Pipeline's crews were forced to excavate deeper than expected because of defective drawings and specifications, and that Duncan Pipeline also suffered a "loss of productivity" due to "utility conflicts, scheduling conflicts, constant relocation of equipment, crews and materials, [and] lack of profiles and elevations." (Id. at 33.)

The United States Court of Federal Claims case law is illustrative when addressing equitable adjustment issues. In order to recover an equitable adjustment for costs incurred due to defective specifications, "the [sub]contractor must show that it relied on the defect and that the defect was not patent or obvious." AAB Joint Venture v. United States, 75 Fed. Cl. 414, 430 (Fed. Cl. 2007) (citations omitted).  Moreover,

> where a contractor-claimant seeks to recover an
> equitable adjustment for additional work performed
> on account of a defective specification, the
> contractor-claimant must show that it was misled
> by the defect. To demonstrate that it was misled,
> the contractor-claimant must show both that it
> relied on the defect and that the defect was not
> an obvious omission, inconsistency or discrepancy
> of significance—in other words, a patent defect—
> that would have made such reliance unreasonable.

E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1339 (Fed. Cir. 2004). Summary judgment is not appropriate in a case involving equitable adjustment claims where there are questions as to project specifics, completion, and delay. Structural Concepts, Inc. v. United States, 103 Fed. Cl. 84, 90-91 (Fed. Cl. 2012). Additionally, fact-finding is often necessary to determine whether site conditions differed from those provided in project specifications and when differing site conditions were discovered. Redland Co. v. United States, 97 Fed. Cl. 736, 752 (Fed. Cl. 2011).

Plaintiffs cite to a recent case in the United States Court of Appeals for the Federal Circuit to illustrate the meaning and scope of relief arising out of "defective specifications." (Doc. 55 at 16.) In ACE Constructors, Inc. v. United States, 499 F.3d 1357 (Fed. Cir. 2007), the Corps required a contractor to conduct a specific type of costly concrete paving

testing that was not included in the original bid. After trial, the Court of Federal Claims ordered an equitable adjustment because it found that ACE acted reasonably in basing its bid on the less expensive testing technique and that the change in testing requirement was a compensable constructive change in a defective specification.  Id. at 1363.  Plaintiffs contend that Duncan Pipeline, just as the contractor in ACE Constructors, reasonably concluded that the in-line gate valves were not to be treated as dead-ends for thrust restraint.

Genuine issues of material fact exist as to the in-line valves and bell restraints, the excavation depth vis-à-vis the Project specifications and drawings, and the loss of production claims.  There are issues regarding the propriety of the trade specifications as to the bell restraints and also as to the notice requirements of the changed conditions.  The Court cannot resolve these factual disputes as to Plaintiffs' argument of an equitable adjustment.  See Structural Concepts, 103 Fed. Cl. at 90-91.

Accordingly, summary judgment as to the equitable adjustments is not appropriate.[6]

c.   Terms of Subcontract

Finally, Defendants move for summary judgment as to Duncan Pipeline's claims for excessive excavation, mobilization, and lost production because the terms of the subcontract expressly waive such relief. (Doc. 44 at 13-15.) Article V of the subcontract provides that Duncan Pipeline "shall not be entitled to receive any amount for overhead or profit or for any inefficiencies or loss of productivity and shall not assert any claim for overhead or profit or damages due to loss of productivity or inefficiencies." (Doc. 1, Ex. A Art. V ¶ 2.) In response, Plaintiffs allege that Duncan Pipeline's original claims remain the same—extra excavation is for extra work, as permitted by the FAR, that the subcontract waiver is barred by Georgia lien law, and that the exculpatory clause is void because the claims at issue involve damage not contemplated at the subcontract's execution. (Doc. 55 at 20-23.)

Under Michigan law, exculpatory clauses that limit damages in construction contracts are subject to an

---

[6] Because the Court finds that Plaintiffs may pursue an equitable adjustment argument as a damages measure, it need not address Plaintiffs remaining notice claims of extended time to submit a claim for equitable adjustment as well as waiver of notice requirements by course of conduct.

41

exception where the damages were not of a kind contemplated by the parties.  See Phoenix Contractors, Inc. v. Gen. Motors Corp., 135 Mich. App. 787, 792 (1984); Owen Constr. Co. v. Iowa State Dep't of Transp., 274 N.W.2d 304, 307 (1979).   Michigan law also allows for damages to be recovered in lieu of an exculpatory clause where a party suffered from obstacles created by the adversary.  John E. Green Plumbing & Heating Co. v. Turner Constr. Co., 742 F.2d 965, 966-67 (6th Cir. 1984) (applying Michigan law). Because there remain genuine issues of material fact as to the equitable adjustment argument presented by Plaintiffs, see supra II(C)(1)(b)(iii), a factual issue also exists as to whether the parties anticipated the type of conditions at the project and whether those conditions were reasonably foreseeable.  See S. Erectors, Inc. v. New York, 1992 U.S. Dist. LEXIS 8704, at *13-14 (S.D.N.Y. June 16, 1992).  Thus, summary judgment on an equitable adjustment argument is not proper.

      2.   Georgia State Law Claims

Duncan Pipeline has also brought several Georgia state law claims.  Of those claims, Defendants have moved for summary judgment as to conversion and punitive damages. Under Georgia law, where a contractual choice of law provision is at issue, the Court will look to the

42

provision's language to determine the scope of claims covered. Baxter v. Fairfield Fin. Servs., 307 Ga. App. 286, 292, 704 S.E.2d 423, 428-29 (2010). Tort claims are only included where a contract's choice of law provision's intent covers any and all claims arising out of the relationship between the parties. Young v. W.S. Badcock Corp., 222 Ga. App. 218, 218, 474 S.E.2d 87, 88 (1996). The traditional Georgia rule of lex loci delicti will apply, which provides that "tort cases are governed by the substantive law of the state where the tort was committed." Manuel v. Convergys Corp., 430 F.3d 1132, 1140 (11th Cir. 2005) (quotations omitted).

Here, the subcontract provides that "[t]his subcontract shall be governed by the laws of the State of Michigan." (Doc. 1, Ex. A, Art. XXVIII(k).) Nowhere in this provision does it state that it covers any and all claims arising out of the parties' relationship. Thus, the subcontract does not provide a choice of law requirement for tort claims by Duncan Pipeline against Walbridge. See Young, 222 Ga. App. at 218, 474 S.E.2d at 88. Accordingly, Georgia law governs the Court's analysis of Plaintiffs' tort-based claims because they are alleged to have been committed in Georgia.

### a. Conversion

Plaintiffs allege that Walbridge took unauthorized possession and wrongfully converted a John Deere front loader that was the property of Duncan Pipeline. (Doc. 1 ¶¶ 62-66.) Defendants have moved for summary judgment on Plaintiffs' conversion claim. (Doc. 44 at 16.) According to Defendants, summary judgment is proper because Plaintiffs have failed to show all the required elements for a conversion claim. (Id.) In response, Plaintiffs contend that Walbridge's unauthorized use of the front loader entitles them to recovery. (Doc. 55 at 23-24.)

Under Georgia law, to recover for conversion, a plaintiff must show title or the right of possession, actual possession in the other party, demand for return, and refusal to return the property. Trey Inman & Assocs. v. Bank of Am., 306 Ga. App. 451, 457, 702 S.E.2d 711, 716 (2010) (quotation omitted). A review of the record in this case demonstrates that Duncan Pipeline never made a demand for the return of the loader or that Walbridge ever refused to return the loader to Duncan Pipeline. As a result, Defendants' motion as to the conversion claim is granted.

### b. Punitive Damages

Defendants have also moved for summary judgment as to Plaintiffs' claim for punitive damages. (Doc. 44 at 17.)

Defendants argue that because the conversion claim should be dismissed, so too must the claim for punitive damages. (Id. at 17-18.)    In response, Duncan Pipeline argues that because it has presented "evidence at least" to demonstrate a jury question, summary judgment is improper. (Doc. 55 at 24.)

Under Georgia law, punitive damages are only available in tort actions. Esprit Log & Timber Frame Homes, Inc. v. Wilcox, 302 Ga. App. 550, 553-54, 691 S.E.2d 344, 348 (2010). Because Plaintiffs' only tort action—the conversion claim—has been dismissed, so too must the claim for punitive damages.    Accordingly, Defendants' motion for summary judgment as to punitive damages is granted.

   3.   Prompt Pay Act, 31 U.S.C. § 3905(b)

Plaintiffs have also sought to recover under the Prompt Pay Act, 31 U.S.C. § 3905(b).    (Doc. 1 ¶¶ 58-61.) Defendants have moved for summary judgment arguing that the Prompt Payment Act does not provide for a private right of action against Walbridge. (Doc. 44 at 18.)    In response, Plaintiffs state that the Federal Prompt Pay Act was incorporated into the subcontract through the inclusion of 48 CFR 52.232-27 in Exhibit F. (Doc. 55 at 24-25.)

Defendants cite to U.S. ex rel. IES Comm., Inc. v. Cont'l Ins. Co., finding a "unanimous conclusion that the

45

[Prompt Payment Act] does not create a private right of action." 814 F. Supp. 2d 1, 2-3 (D.D.C. 2011) (citing L&W Supply Corp. v. Dick Corp., 2009 WL 1139569 at *1 (N.D. Fla. Apr. 27, 2009)); see also C&H Contracting of Miss., LLC v. Lakshore Eng'g Servs., Inc., 2007 WL 2461017, at *1 (S.D. Miss. Aug. 24, 2007). Duncan Pipeline has not advanced any viable argument as to why a purported violation of 48 CFR 52.232-27 would permit a private right of action under the Prompt Payment Act. The Court agrees with the overwhelming majority of courts that have previously addressed this issue, finding that the Prompt Payment Act does not create a private right of action. Accordingly, Defendants' motion for summary judgment as to the Prompt Pay Act is granted.

III. MOTION TO STRIKE

Plaintiffs have also moved to strike Defendants' affirmative defense of a waiver of jury trial and for the Court to make a determination that the matter should proceed to trial before a jury. (Doc. 54.) According to Plaintiffs, the subcontract's pre-litigation waiver of jury trial is unenforceable under Georgia law because doing so contravenes Georgia public policy. (Id. at 4-9.) In response, Defendants argue that the motion is untimely, enforceable under federal law, and that Duncan Pipeline

knowingly and voluntarily waived its rights to a jury trial by signing the subcontract. (Doc. 58 at 1.)

A subsection under Article XIX of the subcontract is captioned "WAIVER OF JURY TRIAL AND COUNTERCLAIM" and provides that

> [t]he parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Agreement, the relationship of Contractor and Subcontractor, and/or any claim of injury or damage.

(Doc. 1, Ex. A Art. XIX.) Defendants answered the complaint and asserted as one of its affirmative defenses that Duncan Pipeline waived its right to a jury trial by signing the subcontract. (Doc. 17, Affirmative Defenses ¶ 4.) Now, Plaintiffs argue that substantive Georgia law requires invalidation of the pre-litigation jury waiver to protect Plaintiffs' rights because Duncan Pipeline could not have made a knowing and voluntarily waiver. (Doc. 54.)

Without addressing the timeliness of Plaintiffs motion to strike, the Court finds that the subcontract's jury waiver is proper. While Plaintiffs maintain that substantive Georgia law is determinative to the right of a jury trial, it is a matter of federal law when the case is being litigated in federal court. Simler v. Conner, 372

U.S. 221, 222 (1963); see also Ford v. Citizens & S. Nat'l Bank, 928 F.2d 1118, 1121 (11th Cir. 1991); Columbus Mills, Inc. v. Freeland, 918 F.2d 1575, 1577-78 (11th Cir. 1990); Owens v. Int'l Paper Co., 528 F.2d 606, 611 (5th Cir. 1976); Ammons v. Franklin Life Ins. Co., 348 F.2d 414, 416 (5th Cir. 1965) ("If there should be any difference between the state and the federal rule, it must be remembered that in the federal courts the right to a jury trial is to be determined as a matter of federal law in diversity as well as other actions."). Thus, this issue must be addressed by federal procedural law.

The Eleventh Circuit has permitted a pre-litigation contractual jury waiver, even where a different result might have been reached under a state's substantive law.[7]   See Ford, 928 F.2d at 1121; see also Bakrac, Inc. v. Villager Franchise Sys., Inc., 164 F. App'x 820, 823-34 (11th Cir.

---

[7] Plaintiffs rely on G.E. Commercial Fin. Bus. Prop. Corp. v. Heard, 621 F. Supp. 2d 1305 (M.D. Ga. 2009), for the proposition that pre-litigation contractual jury waivers may be unenforceable where Georgia is the forum state of a federal district court.   (Doc. 54 at 10-11.)   Based solely on diversity jurisdiction, G.E. Commercial acknowledged that there was no federal interest implicated in the case  and "the fact that the action found its way into a federal court" solely because of diversity jurisdiction.   621 F. Supp. 2d at 1309.   Here, however, the action involves federal statutes—the Miller Act and the Prompt Pay Act—for a federally funded project on a federal military base.   Such considerations distinguish G.E. Commercial from the present action.

2006); Ford, 928 F.2d at 1121; Ammons, 348 F.2d at 416-17. Courts are to enforce contractual jury waivers when those waivers are made knowingly and voluntarily. Brookhart v. Janis, 384 U.S. 1, 4-5 (1966). To make this determination, courts "consider the conspicuousness of the waiver provision, the parties' relative bargaining power, the sophistication of the party challenging the waiver, and whether the terms of the contract were negotiable." Bakrac, 164 F. App'x at 823-24 (citing Leasing Serv. Corp v. Crane, 804 F.2d 828, 833 (4th Cir. 1986)).[8]

The waiver provision of the subcontract is conspicuous—it is a separate section under Article XIX, and captioned with all capital letters. (See Doc. 1, Ex A. Art. XIX ¶ 3.) Next, the Court cannot find that Duncan Pipeline was in a disadvantageous bargaining position vis-à-vis Walbridge. Simply because the subcontract was presented as a take it or leave it is not enough to vitiate a jury waiver. See Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1564-65 (Fed. Cir. 1990); see also Winiarski v. Brown & Brown, Inc., 2008 WL 1930484, at *2 (M.D. Ga. May 1, 2008). At no point

---

[8] The Eleventh Circuit has not provided guidance on the issue of which party bears the burden of proving whether a contractual jury waiver was knowing and voluntary. See Bakrac, 164 F. App'x at 824 n.1. Regardless of whether Plaintiffs or Defendants have the burden, the record here demonstrates Duncan Pipeline made a knowing and voluntary waiver.

was Duncan Pipeline ever forced to accept the subcontract—
Duncan Pipeline was perfectly able to reject Walbridge's
offer.   Third, neither side challenged Duncan Pipeline's
sophistication.   Finally, the lack of the negotiability as
to the subcontract, as discussed above, is not alone
determinative in finding the waiver unenforceable.   In
addition, Duncan Pipeline's admission that its officer did
not read either the subcontract or the jury waiver provision
is not persuasive to make the jury waiver unenforceable.
See Quality Foods, Inc. v. U.S. Fire Ins. Co., 715 F.2d 539,
542 (11th Cir. 1983) ("A person who executes a written
document in ignorance of its contents cannot plead ignorance
in order to avoid the effect of the document.").   Bound by
this framework, the pre-litigation waiver found in the
subcontract is enforceable.   As a result, Plaintiffs motion
to strike (Doc. 54) is denied and any remaining claims will
proceed to a bench trial before this Court.

                          CONCLUSION

     For the foregoing reasons, Defendants' Motion for
Partial Summary Judgment (Doc. 43) is **GRANTED IN PART** and
**DENIED IN PART**.   There exist genuine issues of material fact
as to the interpretation of "claims arising from the
improvement" in the partial unconditional waivers, a
possible equitable adjustment as a damages measure, and the

                             50

subcontract's exculpatory clause as it relates to the forseeability of project conditions. However, Defendants motion as to Plaintiffs' claims for conversion, punitive damages, and Prompt Pay Act is **GRANTED** and these claims are **DISMISSED**.

Defendants' request to exclude portions of Plaintiffs' expert (Doc. 46) is **GRANTED IN PART** and **DENIED IN PART**. The Court finds Mr. Rindt qualified. He may testify to the industry standards and practice pertaining to bell restraints and stored materials, but may not offer opinion as to his interpretation of the subcontract. In addition, Mr. Rindt may not testify as to any of the other remaining opinions challenged by Defendants.

Finally, Plaintiffs' Motion to Strike (Doc. 54) is **DENIED**. Duncan Pipeline knowingly and voluntarily signed a subcontract that contained a provision waiving any right to a jury trial. Such a waiver was conspicuous, fairly entered into by sophisticated parties with the ability to reject the subcontract.

SO ORDERED this 29th day of March 2013.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA